OPINION OF THE COURT
Fuchsberg, J.
On the night of April 14, 1972, two masked men forced their way into the Huntington, Suffolk County, home of Jerry Lo Basso, a reputed bookmaker. Besides Lo Basso, only his wife and his sister-in-law were present. Before leaving, the intruders ransacked the house, took possession of all the jewelry and cash they could lay their hands on, and, angered that the location of additional money in the house may not have been revealed, one of them killed Lo Basso by shooting him in the head. Mrs. Lo Basso, who also received a bullet wound and thereafter suffered a stroke and memory loss, was never able to testify as to these events.
For eight months, despite intensive investigation by over 100 police officers, no clues to the identity of the perpetrators were unearthed. The first lead came that December, when the *293 police were informed that 19-year-old Anne Marie Paixao, who, along with one Tony Franciotti, her employer and lover, had been arrested and indicted on an unrelated kidnapping charge in both Queens and Nassau Counties, had knowledge of the Lo Basso murder. Detectives Rafferty and Rosenthal, in charge of the Lo Basso case for the Suffolk County police, then interviewed her.
As Rafferty was later to testify at trial, Anne Marie told him that, while pretending to be asleep in Franciotti’s apartment during the early morning hours after the Lo Basso murder, she overheard a conversation among the defendant, William Maerling, Maerling’s brother-in-law, Robert Ragonese, and Franciotti in the course of which Ragonese is supposed to have stated that he had shot "the old man”, Maerling said he had shot "the old lady”, and Franciotti mentioned that he had remained in a car outside the Lo Basso home after having told the other two only to "rob them” and "not to shoot anybody”. Rafferty also related how Anne Marie went on to tell him that Franciotti gave her $25 the day after the robbery and that, though nothing was said about its source, when she had had occasion to ask for money several days earlier, he replied he did not have any, but planned to "rip off a bookie” in a few days.
The day after she was interviewed by Rafferty and Rosenthal, Anne Marie went to the Queen’s District Attorney’s office, told them about the information she had supplied and began plea negotiations on the kidnapping indictment. However, she never testified at any stage of the Lo Basso case. Some months after her disclosure and before there was occasion to call her to repeat her information on the stand, she committed suicide. Instead, at trial, Rafferty, over objection, was permitted to recite her revelations to him as a declaration against her penal and pecuniary interest.
Conversations between Anne Marie and her mother, Barbara Paixao, testified to by the mother, were also admitted into evidence on the same theory. According to Mrs. Paixao, at about the time of the murder, the daughter, in refusing the mother’s request for $15, told her she would be able to comply in a few days since Franciotti was going to use a gun to make sure he collected money owed him by "a bookie on Long Island”. The mother also swore that Anne Marie gave her the $15 that weekend; that, upon hearing of the murder and asking whether Franciotti had committed it, Anne Marie *294 replied that he had not; that, at about the time of Anne Marie’s meeting with Rafferty, the daughter repeated to her mother the substance of the statements the detective described on the stand; that Anne Marie had also stated that she herself was not in trouble; and that, when Anne Marie would, as she at times did, mention the names of people involved in other criminal activities in which she or Franciotti participated, neither Maerling’s nor Ragonese’s name ever came up.
In any event, after the January 31 meeting between Anne Marie and Rafferty, things moved rapidly. Fifteen days later William Maerling and Robert Ragonese were arrested, and the next day the Grand Jury indicted Maerling, Ragonese and Franciotti for murder, burglary, and robbery.
On the day of his arrest, Maerling, who could neither read nor write, signed a statement which in substance was consistent with the information received from Anne Marie Paixao; the statement was in Rafferty’s handwriting and witnessed only by him and Detective Rosenthal. Maerling later testified at a Huntley[1] hearing that he was never informed of his Miranda[2] rights, that the statement was false and that he affixed his signature after hours of coercion accompanied by beatings and threats. These claims, vigorously litigated by both sides, presented sharp issues of fact which the suppression court later resolved in favor of the People. The result was that the statement was ultimately received at trial.
Two weeks after his arrest, in the absence of counsel, who had been assigned to him sometime earlier, an oral statement, different in content from the first, but still inculpatory since it did place Maerling in the car outside the Lo Basso house, was taken from Maerling by Lieutenant Cannatella, a Suffolk County Jail officer, under circumstances hereinafter described. After hearing Cannatella and the defendant, the Trial Judge was to rule this statement voluntary and spontaneous and deny defendant’s motion to suppress.
In October, 1973, Maerling’s case was severed from the others and he was brought to trial alone. No identification evidence linked him to the crime. Neither Ragonese nor Franciotti testified. The People’s case rested entirely on out-of-court statements: those of Anne Marie Paixao to Rafferty and *295 to her mother, the one made the day of the arrest by Maerling to Rafferty, and the one taken from him in the county jail. It was on this evidence that he was found guilty on one count of each of the offenses charged and subsequently sentenced to 20 years to life on the murder conviction and to lesser terms to be served concurrently on the other charges. Six months after the Maerling sentence, the indictments against Ragonese and Franciotti were dismissed "in the interest of justice” after the District Attorney had filed an affirmation in which he stated that Anne Marie’s death had made it impossible for the prosecution to establish a prima facie case. The Appellate Division has affirmed Maerling’s judgment of conviction.
For the reasons which follow, we believe. the judgment should be set aside and a new trial ordered. Though, in appropriate circumstances, declarations against penal interest may be admitted to incriminate an accused in a criminal case, on no reasonable view of the evidence were those of Anne Marie Paixao admissible. On the record here it was also reversible error to hold that defendant’s jailhouse statement was made so spontaneously that the absence of counsel may be disregarded.[3]
 Turning immediately to the declaration against interest question, we begin our analysis by emphasizing that the admission of such evidence, as an exception to the hearsay rule, may be said to be dependent, as in general are all out-of-court statements offered to prove the truth of the matter they assert, on a satisfactory showing (1) that resort to such proof is necessary to the discovery of truth and (2) that the proffered evidence is reliable (McCormick, Law and the Future: Evidence, 51 Nev L Rev 218, 219). Simply stated, in the case of declarations against interest, the theory is that such assurance flows from the fact that a person ordinarily does not reveal facts that are contrary to his own interest. Therefore, the reasoning goes, absent other motivations, when he does so, he is responding to a truth-revealing compulsion as great as that to which he would likely be subjected if cross-examined as a witness.
But, in New York, and in many other jurisdictions, for a long time a declaration that would subject the declarant to *296 criminal, as distinguished from pecuniary or proprietary, liability did not suffice (see People v Brown, 26 NY2d 88, 91-93). In Brown, however, we joined the growing trend favoring the admissibility of declarations against penal interest.[4] In that case, we held it reversible error to exclude a third party’s self incriminating statement that tended to exculpate the defendant by supporting his affirmative defense of self-defense. In an uncomplicated illustration, the court suggested that "to receive proof that a man admitted he never had title to an Elgin watch, but not to receive proof that he had admitted striking Jones over the head with a club * * * does not readily withstand analysis” (26 NY2d, at p 91).
But Brown did not deal with the admissibility of a declaration offered by the prosecution to incriminate a defendant. Offering few criteria as to how necessity and reliability are to be evaluated in the case of an exculpatory declaration, it offered none specifically attuned to an inculpatory one. On reliability, it confined itself to a statement that the declaration against penal interest must be material. As to necessity, it stated three circumstances in which there would be a satisfactory showing of the declarant’s unavailability — death, absence from the jurisdiction or invocation of the privilege against self incrimination (26 NY2d, at p 94).
Today, confronting the question of the admissibility of an inculpatory declaration as res nova (see, however, People v Harding, 37 NY2d 130, 135 [Cooke, J., concurring]; People v *297 Cepeda, 61 AD2d 962, mot for lv to app den 44 NY2d 952), we have no occasion to tarry on the question of necessity. Both sides, apparently accepting the idea that no one can be less available than one who is deceased, do not contest the issue.[5]
Proceeding then to the matter of reliability, we note immediately that the court’s holding that the statement in Brown was admissible was not made to turn on the fact that it was offered for the defendant rather than against him, but on the unlikelihood, given the potentially serious consequences to the declarant of his revelation, that he would have admitted to the crime were it not true. In short, it was the inherent trustworthiness of the statement itself that was crucial to its admission (People v Harding, 37 NY2d 130, 135, supra (Cooke, J., concurring); see, also, People v Spriggs, 60 Cal 2d 868; Fine, Declarations Against Penal Interest in New York: Carte Blanche?, 21 Syracuse L Rev 1095, 1120; McCormick, Evidence [2d ed], § 278).
We see no reason to depart from that view. The nature of the ultimate use to which a declaration against interest is put, especially when that use is anticipatable by the declarant, is a factor to be considered in deciding whether the declarant was in a truth-telling frame of mind, but it need not be determinative. One thing is clear: the severe sanctions potentially attendant upon a conviction for crime, whether by way of imprisonment or fine or both, make admissions of guilt among the most disserving of declarations. We therefore conclude that, conceptually, declarations against penal interest may be admissible against an accused. The correctness of this view finds confirmation in its incorporation in respected recent evidence codes (Uniform Rules Evidence, rule 63, subd [10] [1953 version]; Fed Rules Evidence, rule 804, subd [b], par [3]). Indeed, Congress specifically rejected a proposal to exclude from the ambit of Federal rule 804 (subd [b], par [3]) "a statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused” (compare HR Rep No. 93-650, 93d Cong, 2d Sess, pp 21-22 [1973], reprinted in 1974 US Code Cong & Admin News, pp 7051, 7068, with Fed Rules Evidence, rule 804, subd [b], par [3]).).
*298 All this still leaves open the criteria by which a Trial Judge is to be guided in reaching a conclusion that the assurances of truthfulness of a particular statement are adequate or inadequate to warrant admission. Or, put another way, since, as hearsay, the statement is not subject to cross-examination, how do we otherwise insure its reliability? Obviously, a declaration against interest should not be admissible under all circumstances. In a criminal case, reconciliation of the search for truth with concern for fairness to the defendant must proceed with great care. And, where the declaration is inculpatory in character, scrutiny of its reliability should, if possible, be even more circumspect because of the due process protections afforded those charged with crime, including, of course, the requirement that guilt be proved beyond a reasonable doubt.[6]
These caveats in mind, it is clear that the interest which the declaration compromises must be one of sufficient magnitude or consequence to the declarant to all but rule out any motive to falsify. Naturally, for it to have that effect, the declarant must actually be conscious of the adversity. Such knowledge may be the subject of direct proof or may be inferred from the nature of the adverse matter declared and its relationship to the declarant (see 5 Wigmore, Evidence [Chadbourn rev, 1974], § 1461; Richardson, Evidence [10th ed], § 263; Comment, 39 Fordham L Rev 136; Note, Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule, 56 BU L Rev 148, 155). And, needless to say, the making of the declaration, the knowledge of the facts on which its adversity hangs and the awareness of the adversity must act on one another and therefore must be contemporaneous (cf. Hutchins v Hutchins, 98 NY 56, 64).
Moreover, since a statement may in part be disserving and in part self-serving, ideally courts should only admit that portion of an inculpatory statement which is opposed to a declarant’s interest. However, in certain instances, as when an out-of-context admission of the disserving portion will be *299 unfairly prejudicial to the party against whom it is offered, so much of the remainder as places it in an accurate perspective should, in the sound discretion of the court, not be excluded. Except in such cases, consonant with the caution to be exercised when the object of the offer is to incriminate, we do not adopt the view that it is enough for the self-serving matter merely to be closely connected with the disserving portion (cf. in civil cases Livingston v Arnoux, 56 NY 507; but see McCormick, Evidence [2d ed], § 279, p 677). Declarations against interest are not admitted on the credit of their makers, but on their highly disserving nature. It follows that neutral and self-serving statements do not bear the same guarantee of reliability as do the disserving ones contained in the same declaration. It is because, without that guarantee, the trustworthiness of collateral statements may be expected to be open to question, that it generally is preferable to avoid the risk that a defendant’s liberty will be endangered by the jury receiving false hearsay (Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule, 58 Harv L Rev 1, 57-62).
In addition, upon appropriate showing that such evidence is available, the trial court should also exercise a sound discretion to allow proof of the circumstances in which the declaration was made in order that apparent compliance with the criteria for admission may be demonstrated to be illusory. Such an inquiry would be geared to allow opposing counsel to prove that, because it was fueled by mental illness, sensation-seeking, or some other aberrant condition or motive, the declaration’s "hallmark of trustworthiness” was misleading (see Brady v State, 226 Md 422, 429, affd sub nom. Brady v Maryland, 373 US 83; Weinstein & Berger, Weinstein’s Evidence, par 804[b][3][02]).[7] Or, the inquiry might reveal that, though sincerely made, the declaration was the result of an error in perception, memory, language or the like (see Hinton, Changes in the Exceptions to the Hearsay Rule, 29 Ill L Rev 422, 431-432; Note, 62 Nw U L Rev 934, 940).
Applying these criteria to the case before us, we con- *300 elude that it was an abuse of discretion as a matter of law to admit the hearsay statements of Anne Marie Paixao as declarations against interest.
First, Mrs. Paixao’s version of the conversations she had. with her daughter at about the time of the Lo Basso murder contains no declarations against interest. There was no admission that Anne Marie participated in the Lo Basso crimes. The insinuation that she would receive some money after Franciotti went with a gun to collect a debt owed him by a "bookie” at most indicated no more than knowledge on her part of his intention to carry a gun when he did so. The only other relevant statement Anne Marie made at the time was that Franciotti had not been involved in the Lo Basso murder. And, in so far as she confided in her mother as to unrelated crimes in which Franciotti and she had participated, the matter was not only irrelevant but unquestionably collateral as well. Accordingly, none of this testimony should have been admitted into evidence.
Second, even if we were to assume that the statements Anne Marie made to Detective Rafferty (and later repeated to her mother) otherwise satisfied the rule, the "self incriminating” matter in her declarations was, when one considers the insignificance of the amount of money she received as against the immensity of the crime of which it allegedly was part of the avails, too tenuous and too trivial to guarantee their trustworthiness. In fact, although the prosecution characterized the $25 Franciotti gave Anne Marie as a receipt of stolen property, there was no showing that the money was actually the proceeds of the robbery rather than cash he had acquired from another source. Without such an identification, since they were living together and he apparently was her source of support, the inconsequential amount of $25 can hardly be tagged as coming from one source rather than another. Detective Rafferty did offer the conclusory statement that it was "obvious” to Anne Marie that the money was stolen, but it was her conception of whether she had engaged in wrongdoing and not his that governs. He conceded that she had said she never actually asked Franciotti whether it was stolen or not. Furthermore, the record also indicates that Anne Marie told her mother that she was not in any trouble after Detective Rafferty questioned her. Significantly, the Trial Judge made no finding that Anne Marie was aware that the statements *301 she made to Detective Rafferty were against her interest when she made them.
Beyond that, the circumstances under which the declarations were made reveal that Anne Marie may have had motives to fabricate that far outweighed the paltry proof offered to establish their reliability. Her statements were neither spontaneous nor promptly made. They came many months later at a time when the possibility that her help in solving the Lo Basso murder case would win her leniency on the fresh kidnapping indictment had to have been ever-present, if not uppermost, in her mind. Furthermore, her romantic ties to Franciotti, who was also her employer and at least a sometime comrade in crime, presented a strong ulterior motive for her to cast him rather than Maerling in the more limited and less culpable role of an aider and abetter who sat outside in the car and expected that his accomplice would heed his admonition to engage in no gunplay. In the face of this positive and undisputed proof of untrustworthiness, it hardly seems necessary to dwell on Anne Marie’s lifestyle, Detective Rafferty’s description of her as one who, despite her youth, had "street moxie” and knew "all the ins and outs of the [criminal] trade”, and other evidences of her instability, of which her suicide may not have been the least. All or any of these strongly suggest a personality whose statements were by no means to be accepted as reliable merely because they were self-denigrating.
This brings us to the second and independent ground on which we reverse, the admission in evidence of the defendant’s jailhouse confession. Maerling claims that the statement was taken in violation of his right to counsel. As indicated earlier, the trial court decided that it was "spontaneous” and therefore within the ambit of People v Kaye (25 NY2d 139), a "narrow” exception to the rule enunciated in People v Hobson (39 NY2d 479). (People v Tompkins, 45 NY2d 748, 750.)
Of course, if the record contained factual support for the Trial Judge’s finding, we could not interfere (People v Anderson, 42 NY2d 35, 38-39; People v Leonti, 18 NY2d 384, 390). However, that is not the case here, since under no view of the facts can it be said that defendant’s statement was unsolicited (People v Esposito, 37 NY2d 156).
The record, and indeed the Judge’s findings of fact, indicate that the statements must be deemed the product of deliberate elicitation. Relying on the trial court’s findings of fact, we *302 start with the initiation of the episode when Maerling told a guard he wanted to see the duty officer. When Lieutenant Cannatella responded, Maerling told him, "I want to talk to you about something * * * that no one else knows”. As Cannatella testified at the Huntley hearing, he then realized the prisoner was not going to discuss conditions relating to the jail and drew out the fact that Maerling, to quote the court’s findings, "wanted to talk to him about 18 or 19 robberies, get immunity and make a deal”. At no time did the defendant indicate that the crime for which he was then being held was not one of the robberies of which he was offering to talk. The officer did advise him of his Miranda rights, including his right to an attorney. But the defendant, who then had had an attorney for some time, responded that he nevertheless "wanted to talk and tell his attorney about it later”. Cannatella then informed Maerling that he could not give him a deal or immunity and that he would prefer that Maerling speak to someone in the District Attorney’s office. However, when the defendant asked to see an Assistant District Attorney, Cannatella "said he would have to know what it was about”. Maerling then allegedly confessed to the Lo Basso murder, saying that he waited in the car while Ragonese and Franciotti went into the Lo Basso home. Before engaging in this conversation, Cannatella took the defendant into an unoccupied room and closed the door. The conversation lasted 40 minutes.
The principles guiding our protection of a defendant’s right to counsel were unequivocally stated in Hobson: "The rule that once a lawyer has entered the proceedings in connection with the charges under investigation, a person in custody may validly waive the assistance of counsel only in the presence of a lawyer breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary [citing cases]” (People v Hobson, supra, at p 484; see, also, People v Arthur, 22 NY2d 325).
True, in People v Kaye (supra), the court nevertheless permitted the prosecution to use a confession blurted out by a mentally unstable defendant after he had been arrested and the police had been instructed by his lawyer to conduct no interrogation. It did so because it found that the confession was spontaneous. But to come within the rule of that case, the spontaneity has to be genuine and not the result of induce *303 ment, provocation, encouragement or acquiescence, no matter how subtly employed. For such interrogation tactics often may be more destructive of a defendant’s rights than are blatantly coercive techniques.
The unequivocal trend of our decisions has been to guard with increasing zeal the defendant’s precious right to the advice of counsel in deciding whether to waive his equally valuable right not to incriminate himself when confronted with the power and authority of the State in the person of police interrogators.
Thus, in People v Townes (41 NY2d 97) and People v Roberson (41 NY2d 106), we ruled that statements made during interview sessions voluntarily initiated by the defendants were inadmissible because an attorney was not present during the questioning. In Townes, the defendant had complained of police brutality to a civilian review board; this led to an interview in his cell by a police investigator, who asked the defendant to describe what had happened at this arrest. In Roberson, the defendant voluntarily appeared at offices of the civilian review board and police internal affairs division to complain about police brutality and made incriminating statements to police investigators when asked to describe the events surrounding his arrest. And, most recently, in People v Tompkins (45 NY2d 748, supra), we held a waiver of counsel’s presence ineffective and a statement obtained in his absence inadmissible where a defendant insisted on talking to the police in the face of a telephone conversation in which his lawyer had advised him to remain silent.
There is far less evidence of a valid waiver of counsel in the present case. Maerling never talked to his lawyer before his waiver at all. It is one thing for a police officer unavoidably to hear and thereafter to report a statement which in effect is forced on him. It was quite another for Cannatella to engage in the long, two-way conversation whose direction became apparent almost from the beginning. In doing so, he trespassed on the spirit, if not on the letter, of the principles we have reviewed. It follows that Maerling’s statement should be suppressed.
Accordingly, the order of the Appellate Division must be reversed and, because the statement made by the defendant the day after his arrest coupled with the corpus delicti made out a prima facie case, a new trial should be ordered.
*304 Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
Order reversed and a new trial ordered.

. (See People v Huntley, 15 NY2d 72.)

. (See Miranda v Arizona, 384 US 436.)

. Defendant raised, and both sides have also argued, a claim that he was deprived of effective assistance of counsel. In view of our disposition on the other issues, and since we are advised that the counsel in question is no longer assigned to this case, we do not reach that issue.

. At least seven States have adopted evidence codes admitting declarations against penal interest (Cal Evidence Code, § 1230; Kan Stat Ann, § 60-460, subd [j]; Nev Rev Stat, § 51.345, subd 1, par [b]; NM Stat Ann, § 20-4-804, subd [b], par [4]; Wis Stat Ann, § 908.045, subd [4]; NJ Rules Evidence, rule 63, subd [10]; Utah Rules Evidence, rule 63, subd [10]). The courts of at least 13 other States have held declarations against penal interest admissible without legislative authorization. (Deike v Great Atlantic & Pacific Tea Co., 3 Ariz App 430; State v Chong Sing Leong, 51 Hawaii 581; State v Larsen, 91 Idaho 42; People v Lettrich, 413 Ill 172; Brennan v State, 151 Md 265; State v Higginbotham, 298 Minn 1; Sutter r Easterly, 354 Mo 282; State v Williams, 43 Ohio St 2d 88 [semble]; Howard v Jessup, 519 P2d 913 [Okla]; Commonwealth v Hackett, 225 Pa Super Ct 22; McClain v Anderson Free Press, 232 SC 448; Cameron v State, 153 Tex Crim 29; Newberry v Commonwealth, 191 Va 445.) In addition, the courts of Maine and Washington have indicated a willingness to adopt the rule if presented with an appropriate case. (State v Gervais, 317 A2d 796 [Me]; State v Garrison, 71 Wn 2d 312; State v Gardner, 13 Wash App 194.) Scholarly commentary favoring the exception includes Wigmore on Evidence (vol 5 [Chadbourn rev, 1974], §§ 1476, 1477); Fine, Declarations Against Penal Interest in New York: Carte Blanche? (21 Syracuse L Rev 1095); Note, Declarations Against Penal Interest: Standards of Admissibility under an Emerging Majority Rule (56 BU L Rev 148); Comment (39 Fordham L Rev 136).

. For an interesting discussion of a trend towards a principle of "practical unavailability” see Wigmore on Evidence (vol 5 [Chadboum rev, 1974], § 1456); Note, Declarations Against Interest: A Critical Review of the Unavailability Requirement (52 Cornell LQ 301, 305-306).

. In Dutton v Evans (400 US 74), the Supreme Court sanctioned the use at trial against a criminal defendant of an extrajudicial statement it claimed could be characterized as a declaration against penal interest. Nevertheless, overall, the court has been less than definitive in spelling out the relationship between hearsay and the confrontation clause (Weinstein & Berger, Weinstein’s Evidence, par 804[b][3][02]; Fine, 21 Syracuse L Rev 1095, 1120-1134A; Younger, Confrontation and Hearsay: A Look Backward, A Peek Forward, 1 Hofstra L Rev 32). In the light of our disposition of the present case, we do not now reach the constitutional confrontation question.

. In Chambers v Mississippi (410 US 284), a case involving an exculpatory declaration by a declarant who thereby confessed to a murder for which the defendant was being prosecuted, the Supreme Court, in holding that the statement carried sufficient credentials of trustworthiness to warrant admission, laid stress on the presence of "corroborating” circumstances in the form of evidence that the declarant was at the scene of the crime, that he possessed a firearm of the sort used in the killing and that he had admitted his guilt soon after the criminal event had occurred.