OPINION OF THE COURT
James G. Starkey, J.
On or about January 24, 1990, one Antoine Taylor was shot to death in this county with a nine millimeter handgun. The weapon used was not recovered for three days. Then, as the *432 result of an apparently unrelated incident, it was located by the police in an automobile operated by the defendant.
The question presented here is whether information provided by unidentified citizen-informants to the effect that they had witnessed gunplay and that a loaded weapon was located in a described vehicle — when accompanied by other indicators of reliability of the information — could give rise to probable cause for a search of the car and seizure of the weapon. The conclusion reached is that, on the facts presented here, the answer is yes. It could and it did.
The defendant was arrested on January 27, 1990 and indicted for murder in the second degree and criminal possession of a weapon in the second degree. He moved to suppress tangible evidence seized at the time of his apprehension — the loaded nine millimeter pistol, as well as a quantity of additional ammunition — and a hearing was held on August 13th and 14th, 1991. Two witnesses, Police Officers John Bermudez and Edward Fuentes, testified for the prosecution and their testimony was credible in all respects. The motion was denied on September 11, 1991. The following are the findings of facts and conclusions of law.
FINDINGS OF FACT
Shortly after 2:00 a.m, on January 27, 1990 — three days after Antoine Taylor was killed — the defendant and two companions, a male and a female, were involved in a shooting incident in a parking lot near 921 Myrtle Avenue, Brooklyn. Several shots were fired attracting the attention of many witnesses, and substantially damaging two or more automobiles in the lot. At least three witnesses observed the shots being fired, and then saw the culprits jump into a gray Volvo with tinted windows. The vehicle proceeded westbound on Myrtle Avenue, but not before the same three witnesses also noted the automobile’s New York license number: 3FG678.
About 2:10 a.m. Police Officer John Bermudez and his partner, Police Officer Edward Fuentes, who were on patrol nearby, received a radio call that a man had possibly been shot in the parking lot. The police officers proceeded toward the scene and, en route, received a second call stating that a gray Volvo was being used by the perpetrators of the parking lot episode. Upon arrival at the lot, the police officers saw 10 or more agitated people and two or more automobiles with broken glass and what appeared to be bullet holes in the *433 windows, doors and fenders. Successively, at least three individuals approached the police officers and, separately, stated excitedly that each had observed the incident in which the automobiles had been damaged by gunfire. Each witness also stated that the armed culprit had recently left the scene in a gray Volvo, with tinted windows, bearing license plate number 3FG678 and fled in a westerly direction on Myrtle Avenue. At 2:17 a.m. Officer Bermudez notified other units by radio of the episode stating that the perpetrators had fled westbound on Myrtle Avenue in the described vehicle, including the license number. Officer Bermudez then attempted to obtain the name of the individuals who had reported the incident, both each— apparently fearing retribution — refused to identify himself stating that he did not "want to be involved”.
Immediately thereafter, at 2:19 a.m., Officer William Mann and Sgt. Arthur Mattor observed the automobile a few blocks away, heading west on Myrtle Avenue at the corner of Marcy Avenue. Officer Mann and Sgt. Mattor promptly directed the driver, the defendant Isaac Sanchez, to pull over and — believing at least one gun to be present — instructed him and his two passengers (a male and a female) to exit the vehicle. A frisk of the occupants and examination of the passenger compartment under the seats and near the doors revealed no weapons. Officer Mann then opened the glove compartment and found a loaded nine millimeter handgun and 49 additional rounds of ammunition. The defendant and both passengers were then brought to the 79th Precinct and booked for possession of the weapon. Later, examination of the weapon by the ballistics unit of the police department revealed that the same weapon had been used in the commission of the homicide which is the basis for the murder charge in the indictment.
CONCLUSIONS OF LAW
On a motion to suppress physical evidence, the prosecution has the burden of going forward in the first instance to show the legality of the police conduct. (See, People v Berrios, 28 NY2d 361, 367 [1971].) Nevertheless, the defendant bears the ultimate burden of proving illegality by a preponderance of the evidence. (See, People v Caple, 31 AD2d 752 [2d Dept 1969]; People v Merola, 30 AD2d 963 [2d Dept 1968].)
While it is true that the search of the automobile in this case was conducted without a search warrant, that fact is not by itself dispositive of this motion. It is well settled that when *434 there is probable cause to believe that contraband is located in an automobile or other vehicle, a lawful search for the property may be made without a warrant, pursuant to what has been termed "the automobile exception”. (See, Chambers v Maroney, 399 US 42 [1970]; Carroll v United States, 267 US 132 [1925].)
The issue then centers on the belief of the police officers that at least one gun was located in the car and whether that belief rose to the level of probable cause: "a reasonable belief that * * * evidence of a crime may be found in a certain place”. (See, People v Bigelow, 66 NY2d 417, 423 [1985].)
Further, since the evidence relied upon by the police in searching the car was based, at least in part, on hearsay (the statements of the people encountered in the parking lot) the Aguilar-Spinelli rules relative to the evaluation of hearsay are applicable in determining whether probable cause existed. (See, Aguilar v Texas, 378 US 108 [1964]; Spinelli v United States, 393 US 410 [1969].)*
It is settled that probable cause may be supplied, in whole or in part, through hearsay information. (See, People v Landy, 59 NY2d 369, 375 [1983]; People v Rodriguez, 52 NY2d 483, 488-489 [1981]; People v Hanlon, 36 NY2d 549, 556 [1975].) But before this can occur it must appear, pursuant to the AguilarSpinelli rules, that the informant has a valid basis of knowledge for the information transmitted to the police and, further, that the information is reliable. (See, People v Landy, supra, at 375; People v Rodriguez, supra, at 488-489; People v Hanlon, supra, at 558.)
A valid basis of the informant’s knowledge must be demonstrated because information related by an informant, even a reliable one, is of little value if he is dealing in suspicion or rumor and does not have knowledge of the events he describes. (See, People v Rodriguez, supra, at 491.) Conversely, no matter how solid his basis of knowledge, the information will not support a finding of probable cause unless it is reliable. Reliability can be established by either demonstrating the inherent credibility of the informant or the reliability of the *435 informant on this particular occasion. (See, People v Johnson, 66 NY2d 398, 403 [1985]; 1 LaFave, Search and Seizure § 3.3 [a], at 613 [2d ed 1987].)
Each of the informants involved here clearly indicated that his statement was based upon personal observations, thereby narrowing the issue presented to that of their reliability. In that regard, the fact that the informants were not identified certainly does not strengthen the proposition that probable cause existed. But while that is so, it goes much too far to suggest that information received from an unidentified citizen-informer can never be demonstrated as sufficiently reliable to support a finding of probable cause. (See, e.g., Matter of Elvin M., 151 AD2d 674 [2d Dept 1989].)
It is true that when cases have discussed an informant’s reliability, they have usually mentioned his "track record”— his past performance as a supplier of information — and such other indicia as statements made under oath and admissions against penal interest. (See, People v Johnson, supra, at 403.) But it is well settled that reliability of an informant’s information can also be sufficiently established by means showing the reliability of the information itself, including police investigation which corroborates the details of the information received. (See, e.g., People v Johnson, supra; People v Comforto, 62 NY2d 725, 727 [1984]; People v Alaimo, 34 NY2d 187, 189 [1974].) As noted in People v Elwell (50 NY2d 231, 237 [1980]): "Reliability of the informant as distinct from his information can be established * * * by the personal observation by the police of sufficient details corroborative of the informant’s data to indicate that he knew whereof he spoke. Reliability of the informant, therefore, can be corroborated by details concerning dress, mannerisms, route or conveyance to be used by the subject of the information, which in themselves are wholly unsuggestive of crime.”
Indeed, it has been held that even information obtained from a proven liar can be sufficiently corroborated by such means. (See, e.g., Commonwealth v Dickerson, 468 Pa 599, 364 A2d 677 [1976] [informant’s second story held to provide probable cause because it, unlike a prior untruthful story, corresponded with information in the hands of the police]; see also, 1 LaFave, Search and Seizure § 3.4 [a], at 721-722 [2d ed 1987].)
The same principle necessarily applies to information received from unidentified citizen-informants — information not *436 burdened by a negative history which undermines — in terms of reliability — the statements of disreputable people. The applicability of the principle to informants even more anonymous than those involved here was noted by the United States Supreme Court in Illinois v Gates (462 US 213 [1983]). There, in discussing the application of the Aguilar-Spinelli standards by the Illinois Supreme Court to information which included an anonymous letter, the court observed (supra, at 227-228): "The Illinois Supreme Court also properly recognized that [a detective’s] affidavit might be capable of supplementing the anonymous letter with information sufficient to permit a determination of probable cause. See Whiteley v. Warden, 401 U.S. 560, 567 (1971).” (See also, United States v Easter, 552 F2d 230, 233-234 [8th Cir 1977] [probable cause held to have been established when man who identified himself only as "Victor” complained of robbery and disappeared as police searched house and seized illegal weapon].)
The question here then becomes whether the indicia of reliability are sufficient to establish probable cause, notwithstanding the fact that each informant was unidentified. Four persuasive factors support the conclusion that they are.
In the first instance, not one, but three informants separately provided essentially the same information to the police, each corroborating the other. (See, United States v Ellison, 793 F2d 942 [8th Cir 1986]; People v Fontaine, 122 AD2d 71 [2d Dept 1986].)
Secondly, the information was not given in an insulated way (not, for example, by an anonymous telephone call), but face to face — enabling the police to observe the facial expressions and emotional status of what appeared to be citizen-witnesses, with no reason to suspect an untoward motive or lack of reliability. (See, People v Fontaine, supra; 1 LaFave, Search and Seizure § 3.4 [a], at 717 [2d ed 1987].)
In the third place, beyond the corroboration that each informant gave the others, the information given was detailed and supported in important respects by police observations. They included the report of shooting in the parking lot which triggered the police radio calls, the presence of the excited crowd (the sort of crowd that would gather in the wake of such an episode), what appeared to be gunfire damage to automobiles parked in the lot, the precise description — including the license plate — of the getaway car, the reported route of flight, and the discovery of a car — precisely fitting the *437 description — nearby on the route described. (See, People v Elwell, supra, at 237.)
Finally, the reliability of the statements made by each informant was reinforced by the extraordinary nature of the event reported, the brief time interval from the shooting to the arrival of the police and the excited and spontaneous way in which each informant gave his report. It has been noted the declarations against penal interest are admissible at trial as exceptions to the hearsay rule because the declarant’s interest against being criminally implicated gives reasonable assurance of the reliability of his statement. (See, People v Johnson, supra, at 403; People v Maerling, 46 NY2d 289, 295-298 [1978]; People v Brown, 26 NY2d 88 [1970]; People v Egan, 78 AD2d 34, 36-37 [4th Dept 1980].) This general assurance of reliability has also been deemed sufficient when evaluating hearsay in connection with probable cause determinations. (See, People v Comforto, supra; United States v Harris, 403 US 573, 583 [1971].)
Similarly, excited utterances are admissible at trial as exceptions to the hearsay rule because there is reasonable assurance that what is said by excited people speaking without the opportunity for reflection is also reliable. (See, People v Brooks, 71 NY2d 877 [1988]; People v Brown, 70 NY2d 513 [1987]; People v Edwards, 47 NY2d 493 [1979].) Necessarily, that principle applies in probable cause determinations, as well. (See, United States v Patterson, 495 F2d 107, 111 [DC Cir 1974].)
Indeed, the facts of the Patterson case (supra) are similar in important respects to those presented here. In that case police officers in the District of Columbia, while on routine patrol, encountered a large crowd on a street and asked what had happened. One person told them that a man had been shot. Then, after the officers had traveled a few more feet, another member of the crowd stated that not only had there been a shooting, but that the assailant was across the street. The person indicated the defendant, who was animatedly talking with another man near the trunk of an automobile. The defendant then ended the conversation and began to start the car. At that point, one officer heard members of the crowd mutter that the gun was in the trunk, but no one would identify himself as having said so. Nevertheless, the police promptly stopped the defendant from leaving, arrested him, secured the automobile and applied for a warrant to search it. The affidavit related that a person had indeed been shot a *438 short time before the police had arrived and presented, in essence, the facts set forth above.
The search warrant was issued and a weapon, muffler and silencer were seized in the search that ensued. The Court of Appeals upheld a conviction for violation of the National Firearms Act and, applying the Aguilar-Spinelli standards, held that the information possessed and presented by the police provided probable cause for a search of the automobile. The court noted that the exclamations of the crowd, soon after an exciting event, provided indicia of reliability and were reinforced by the observations of the police.
The principles referred to above are, of course, not impaired by the fact that in this case police officers without personal knowledge made the search. It is well settled that the knowledge of the police officers at the parking lot was imputed to those who apprehended the defendant. (See, People v Lypka, 36 NY2d 210 [1975].)
It should be noted that had even one of the witnesses identified himself, probable cause would have been established beyond cavil. (See, People v Crespo, 70 AD2d 661 [2d Dept 1979].) It is unfortunate when — as occasionally occurs — an understandable fear of retribution, by itself, requires termination of a criminal proceeding. This is not one of those cases. The conclusion abides that, while the refusal of the witnesses to identify themselves reduced the quantum of the evidence, what remained still constituted probable cause to believe that the automobile contained a loaded firearm and that the property in question was lawfully seized.

 The Aguilar-Spinelli standards no longer control in the Federal courts, having been replaced by the "totality of the circumstances” test. (See, Illinois v Gates, 462 US 213 [1983]; see also, Massachusetts v Upton, 466 US 727 [1984].) The New York Court of Appeals, however, declined to follow the United States Supreme Court in overruling the Aguilar-Spinelli test and the rule remains the criterion in this State. (See, People v Johnson, 66 NY2d 398 [1985]; People v Bigelow, 66 NY2d 417 [1985].)