*931 OPINION OF THE COURT
John M. Leventhal, J.
Facts
On July 23, 2005, a corpse was found at 3022 Brighton Second Street, Kings County. The body was later identified as Angela Pogucatove, the decedent in this case. Detectives James Normile and Christopher Cranston of the Brooklyn South Homicide Squad became involved in the investigation and on July 24, 2005 at approximately 12:30 p.m., they visited the victim’s last known address. The detectives learned that the decedent lived with the defendant, Nikolay Baranov, in a basement apartment and therefore knocked on his door in an attempt to locate relatives of the victim. The defendant told the detectives that he lived in the apartment with his son, who had gone back to Russia some time back, and a girl named Angela, who had gone back to Russia either Monday or Tuesday of that week.[1]
At this point in time, the detectives asked the defendant to accompany them to the 60th Precinct because they knew the victim was not in Russia where he stated she was. The defendant was not arrested or in handcuffs. No weapons were drawn and defendant was not questioned during the five-minute ride to the precinct. Further, according to Detective Normile’s testimony at the Huntley hearing before this court, the defendant was alert, understood the detectives, and was able to communicate with them effectively in English. The detectives surmised that the defendant was Russian from his accent but did not perceive a need to obtain an interpreter because they did not have trouble communicating with him.
At the precinct, the defendant was placed in an interview room. The room was approximately 8 feet by 10 feet, with a table, three or four chairs, and a one-way mirror on the wall. The detectives advised the defendant of his rights under Miranda v Arizona (384 US 436 [1966]). Since neither detective speaks Russian, the Miranda warnings were given in English. No interpreter or attorney for the defendant was present in the room and the defendant did not request an interpreter or attorney at this point in time. The detectives and the defendant also signed a Miranda form. The “yes” responses to the questions on this form were made by one of the detectives.
*932 At approximately 1:30 p.m., the defendant made an oral statement. He appeared alert and spoke in English. The detectives asked the defendant if he would like them to write out a statement and he assented. Detective Normile handwrote the statement contemporaneously as it was made by the defendant. After the defendant signed this statement, at approximately 2:00 p.m., he indicated that he would like to add something. A second statement was prepared and marked as signed at 2:50 p.m.[2] Approximately one hour after the defendant made his oral statement, Detective Cranston memorialized it on a DD5, without referring to Detective Normile’s statements.[3] Detective Normile testified that at the time the defendant made his oral statement in the interview room, no threats were made against him, no weapons or handcuffs were used, and defendant was not promised anything in return for his statement.
After this statement was made, the defendant asked if he could write out his own statement in Russian. The detectives provided him with a piece of paper and a pen and the defendant began writing. At approximately 4:00 p.m., the defendant was interrupted while writing this statement. He was moved to another room because an assistant district attorney (ADA) arrived to obtain a videotaped statement. The ADA gave the defendant Miranda warnings again, and, at this point, the defendant asked for an attorney. All questioning of the defendant stopped and he was placed back in the interview room. The defendant asked the detectives why they had stopped and the detectives explained that they could no longer speak with him once he requested an attorney.
The defendant then asked the detectives if he could continue writing the statement that he had started prior to leaving the interview room. The detectives conferred with an assistant district attorney from the homicide bureau who told them to allow the defendant to continue writing if he wanted to, but not to ask him any questions. The detectives therefore returned the paper and pen to the defendant and permitted him to complete his statement. The detectives knew that the defendant had written one full page and started a second before he asked for an attorney. Yet, it was not established how much defendant had *933 written on the second page. Upon finishing his statement, the defendant signed it. This statement was translated by a Russian-speaking detective and sought to be admitted into evidence by the People.
Issue Presented
The issue presented is whether a suspect held in custody is permitted, upon his own request, to continue writing a statement that he had started before he requested the presence of an attorney.
Discussion
In New York, the right to counsel is grounded on this State’s constitutional and statutory guarantees of the privilege against self-incrimination, the right to the assistance of counsel, and due process of law (People v Davis, 75 NY2d 517 [1990]; People v Cunningham, 49 NY2d 203 [1980]; People v Settles, 46 NY2d 154 [1978]). The New York right to counsel extends well beyond that afforded by the Sixth Amendment of the United States Constitution and other state constitutions (compare Cunningham, 49 NY2d at 210 [in which the Court held that once a defendant invokes the right to counsel, that right may not be waived in the absence of counsel], with Edwards v Arizona, 451 US 477 [1981] [which allows defendants to waive the right to counsel without counsel’s presence]).
There are two well-defined situations in which the right to counsel is said to become indelibly attached and a waiver will not be recognized unless expressed in the presence of counsel. The first is once formal proceedings have commenced, whether or not the accused has retained or requested an attorney (Davis, 75 NY2d at 521; People v Samuels, 49 NY2d 218 [1980]; Settles, 46 NY2d 154 [1978]; People v Di Biasi, 7 NY2d 544 [I960]). The second line of cases relates to individuals in custody who have not been formally charged with any crime or offense, but who have retained or requested an attorney.
In this case, it is the latter scenario under which the defendant’s right to counsel was invoked. At the time the defendant requested a lawyer, formal proceedings had not been commenced, yet he was in custody because he had been read his Miranda warnings and he was not “free to leave” the police station (People v Harris, 48 NY2d 208, 215 [1979]; People v Yukl, 25 NY2d 585 [1969]; People v McGowan, 201 AD2d 743 [1994]). Upon requesting the assistance of an attorney, an indelible right *934 to counsel attached in favor of the defendant. Accordingly, the police were not able to question him about the charges for which he was in custody in the absence of counsel (Cunningham, 49 NY2d 203 [1980]; People v Hobson, 39 NY2d 479 [1976]). The defendant was not able to waive the right to counsel or the right to remain silent in the absence of counsel (People v West, 81 NY2d 370 [1993]; People v Rogers, 52 NY2d 527 [1981]). Despite these strict mandates, spontaneous statements are admissible once the right to counsel has already attached (People v Howard, 60 NY2d 999 [1983]; People v Kaye, 25 NY2d 139 [1969]; see also People v Dove, 176 AD2d 266 [1991]).
In this case, upon the defendant’s request for counsel, the officers ceased all questioning and interrogation relating to the victim. The defendant did not waive his right to counsel in the presence of appointed or otherwise retained counsel. Therefore, the second portion of defendant’s written statement may only be admitted into evidence if it constitutes a spontaneous statement.
The standard used to determine whether a statement is spontaneous is whether it is “genuine . . . and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed” (People v Lanahan, 55 NY2d 711, 713 [1981] [internal quotation marks omitted]; People v Maerling, 46 NY2d 289 [1978]). It cannot be triggered by police conduct which should reasonably have been anticipated to evoke an incriminating response from the defendant (People v Lynes, 49 NY2d 286 [1980]; People v Vasquez, 198 AD2d 460 [1993]). The People have the burden of proving the genuine spontaneity of the defendant’s statements beyond a reasonable doubt (People v Stoesser, 53 NY2d 648 [1981]; People v Brooks, 69 AD2d 884, 886 [1979]).
The People contend that the defendant’s statement is spontaneous because the police did not put him in a position in which he would be induced to make the statement. For this proposition, the People cite People v Grimaldi (52 NY2d 611 [1981]), where the defendant made inculpatory statements during a telephone call to his father, after he had invoked his right to counsel. A detective overheard these statements. The Court of Appeals found the statements not to be spontaneous because the officer questioned the defendant after he had invoked his right to counsel and the officer was able to overhear the statement as the result of strategically placing himself near the defendant while he made the phone call. The People maintain that *935 because the defendant’s statement in the case before this court was not evoked by such trickery or improper questioning, it is spontaneous.
The People also maintain, based on People v Maerling (46 NY2d 289 [1978]), that defendant’s statement is spontaneous because it was not the product of a lengthy conversation that was likely to induce him to make an inculpatory statement. In Maerling, the defendant’s statement was found not to be spontaneous where he asked to speak with an on-duty officer, the officer confirmed that the defendant wanted to make a statement to an assistant district attorney, and the officer told the defendant he had to make all statements to the officer that he wished to make to the assistant district attorney.
This court finds that the People have not proven the genuine spontaneity of the defendant’s statement beyond a reasonable doubt. In Grimaldi, the Court of Appeals emphasized that a truly spontaneous statement must be “blurted out by the defendant” and “in effect forced upon the officer.” (52 NY2d at 617.) In Maerling, the Court of Appeals focused not only on the length of the conversation between the on-duty officer and the defendant, but also on the fact that the inculpatory direction of the conversation was apparent to the officer from its beginning. By engaging in such a conversation, the officer “trespassed on the spirit, if not on the letter, of the [right to counsel] principles we have reviewed” (Maerling, 46 NY2d at 303).
In this case, the defendant’s statement was not blurted out or forced upon the officer, but was the product of an exchange between the defendant and the detectives who had questioned him. Although the detectives did not question the defendant any further upon invocation of his right to counsel, or engage in the functional equivalent of questioning, they also did not scrupulously honor the indelible right to counsel. Instead, knowing that the defendant had invoked this right, they spoke with an assistant district attorney to get an opinion on defendant’s ability to continue writing his statement and ultimately provided the defendant with the authority and the means (returning paper and pen) to continue making the statement. While the detectives may not have induced this statement by trickery or provoked the defendant to make it (see e.g. People v Ferro, 63 NY2d 316 [1984] [defendant made incriminating statements after police officer placed stolen furs in front of the cell where he was being held]), and even though the police are under no obligation to prevent the defendant from making an incrimi *936 nating statement (People v Rivers, 56 NY2d 476 [1982]), the detectives’ affirmative response to the defendant’s request to make the statement facilitated its completion in the absence of an attorney.
The defendant’s statement is more akin to the statement found not to be spontaneous in Maerling because it was not unavoidably heard by the officers. Further, the officers knew the “direction” of the conversation once the defendant asked them whether or not he could complete his written statement. Therefore, the latter portion of the defendant’s statement, made after he invoked his right to counsel, must be suppressed. The first portion of the defendant’s statement, made prior to his invocation of the right to counsel, is admissible (see People v Brown, 216 AD2d 670 [1995] [admitting defendant’s oral confession made prior to his invocation to the right to counsel]).
Defense counsel failed to submit a brief to the court, as requested, and is therefore precluded from presenting an argument on the suppression issue. However defense counsel will be permitted to present an argument for admitting additional pages of the statement pursuant to the evidentiary doctrine of completeness. According to this doctrine, “a party offering part of the contents of a prior statement, whether of an adversary or of a witness, may be required to introduce all relevant parts of the statement, including those favoring the adversary, to avoid misleading the trier of fact about the statement’s tenor” (Prince, Richardson on Evidence § 1-102, at 2 [Farrell 11th ed]; see also People v Gallo, 12 NY2d 12, 15 [1962]).
Accordingly, the defendant’s motion to suppress all but the first page of the statement written in Russian is granted.

. Following a Huntley hearing before this court, this statement was deemed admissible.

. Following a Huntley hearing before this court, suppression of these two statements was denied.

. Suppression of this statement was also denied, but it was noted that it might be unnecessary at trial because it is the functional duplicate of Detective Normile’s statements.