[896 NYS2d 575]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v BENNI PRYOR, Defendant.

Supreme Court, New York County, December 22, 2009

### APPEARANCES OF COUNSEL

*Javier Damien*, New York City, for defendant. *Robert M. Morgenthau, District Attorney* (*Jon Veiga* of counsel), for plaintiff.

### OPINION OF THE COURT

LAWRENCE K. MARKS, J.

This case presents the question of when the police, after stopping a car for a traffic infraction and then directing the motorist to step out of the car, are authorized to enter the car themselves to retrieve the vehicle paperwork.

Defendant, indicted for criminal possession of a weapon in the second degree and unlawful possession of marijuana, moves to suppress a firearm, firearm clip, bullets and marijuana recovered from the automobile he was driving. He also moves to suppress statements he made at the time of his arrest and later at the precinct. At a hearing on the motion, the People presented the testimony of Police Officers Daniel Ehrenreich and Richard Pengel. In addition, defendant testified in his own behalf.

While there were some differences in the recollections of the two police witnesses, their testimony, although partially contradicted by defendant's testimony, was essentially consistent and is credited by the court where it differs from defendant's testimony. The credible testimony adduced at the hearing supports the following findings of fact.

## I.

At approximately 10:15 P.M. on the night of May 7, 2009, Officers Ehrenreich and Pengel, along with their supervisor, Sergeant Miller, were on routine patrol traveling southbound on Fifth Avenue in an unmarked patrol car. When Pengel observed an automobile make a right hand turn onto West 129th Street without using a turn signal, he directed Ehrenreich to pull the car over for a routine traffic stop. Ehrenreich turned his attention to the car and further noticed that it had no rear license plate. Both Ehrenreich and Pengel were veteran police officers from the anti-crime squad who each had participated in

hundreds of arrests during their six-year careers. Using their lights and siren, the officers pulled the car over on West 129th Street about midway between Fifth and Lenox Avenues.

As the officers got out of their car and walked toward the vehicle, a late-model sports car, they observed the driver make a reaching motion toward the center rear of the car. As they came closer, they also saw a paper document affixed to the interior of the upper left-hand corner of the car's tinted rear window. Although the document was placed in a location consistent with a temporary registration tag, the officers could not immediately confirm the validity of the tag due to the dark tint of the window.

Ehrenreich and Sergeant Miller continued to the driver's side window, while Pengel approached the passenger side. Each officer had a flashlight, which they each used to illuminate the interior of the car. Ehrenreich asked the driver (the defendant), who was alone in the car, for his license, registration and insurance card. Defendant immediately expressed annoyance at having been stopped. He complained that he had just been pulled over by other police officers and wanted to know why he was being stopped. Ehrenreich did not respond directly to defendant's question, but again asked defendant for his driver's license, registration and proof of insurance. Defendant then produced his driver's license, but failed to produce the registration or insurance card. When asked yet again for the registration and proof of insurance, defendant began what appeared to the officers to be a random search of the front interior of the two-seat sports car. As he was searching, defendant continued to be "visibly agitated" and, after a few more moments of defendant's fruitless rummaging around the front area of the car, Ehrenreich again asked him for the documents. Defendant then stopped looking in the front area of the car and turned towards the area behind the driver's seat. As he began to reach behind the front seats into the cramped rear area of the two-seat car, he told Pengel to stop shining the flashlight in his eyes. As it was described by Ehrenreich, defendant began to reach behind the seats and then "actually stopped and had a real hard stare at all, stopped all movement, began breathing heavy." At this point, Ehrenreich feared defendant was "getting agitated to the point he could get combative towards us," and he therefore ordered defendant to stop what he was doing and get out of the car.

When defendant stepped out of the car, Ehrenreich conducted a brief frisk for weapons and, finding none, told him to walk to

the rear of the vehicle. Ehrenreich once more asked where the registration and insurance card could be found, but instead of answering the question, defendant replied that he would get them and started back toward the open driver's door of the car. Ehrenreich stopped him with his arm, and once again asked defendant to tell him where the paperwork could be found. Defendant replied that the documents were in a glove compartment that was behind the driver's seat. Defendant's response surprised Ehrenreich because it seemed inconsistent with defendant's earlier inability to produce the documents when repeatedly asked.

Ehrenreich then entered the car for the limited purpose of retrieving the registration and insurance documentation from the glove compartment behind the driver's seat—the place where defendant said it was located. He found an unlocked glove compartment behind the driver's seat, and when he opened it he immediately noticed a bag of marijuana on top of paperwork. Once he discovered the marijuana, Ehrenreich stopped looking for the paperwork, and instead began a full search of the vehicle for additional contraband.

During his subsequent search of the car, Ehrenreich discovered another glove compartment, this one locked, behind the passenger seat. To open it, he used the car's ignition key. Inside the glove box he discovered a .380 Bryco handgun as well as a separate clip with bullets. Meanwhile, when Pengel advised defendant that marijuana had been discovered in his car, defendant remarked that he did not smoke pot, and that it belonged to his brother. Pengel then told defendant that if all he had in the car was the marijuana it "was no big deal." As soon as Ehrenreich discovered the gun and ammunition, however, defendant was *immediately arrested, handcuffed and taken to the 32nd Precinct.*

Approximately three hours later, at the precinct and in the presence of Pengel, defendant was interviewed by a Detective Pressley. After being read his *Miranda* warnings, defendant said that he fully understood them and agreed to waive his rights and talk to the police. He told Pressley that his brother had used his car that day and had picked him up from work, that he did not know a gun was in the car and that the marijuana belonged to his brother. When asked whether his fingerprints would be found on the gun, the defendant replied that he had not touched a gun in recent months, but that he had touched a gun briefly in someone's house about six months before, al-

though he did not know whose gun that was. When the interview ended, and Pengel was escorting defendant out of the room, a Detective Moree, who was responsible for checking the Integrated Biometrics Identification System to determine if the gun was registered to defendant or had been used in a crime, asked Pengel what type of gun it was. When Pengel replied that it was a ".380 Bryco" firearm, defendant suddenly remarked that he had thought the police were asking about another gun and that in fact he had touched that gun.

## II.

In reviewing the propriety of a confrontation between the police and a citizen, the touchstone of any analysis under the Fourth Amendment is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." (*Pennsylvania v Mimms*, 434 US 106, 109 [1977], quoting *Terry v Ohio*, 392 US 1, 19 [1968].) The Constitution acts as a safeguard against "arbitrary intrusions by government" and is designed to protect the citizenry from those intrusions that are "based upon mere whim, caprice or idle curiosity." (*People v De Bour*, 40 NY2d 210, 217 [1976].) A court "must consider first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible." (*Id.* at 215.)

In this case, when the police observed defendant make a turn without signaling and then noticed that the car he was driving had no rear license plate, they were clearly entitled to stop him to issue a traffic ticket. (Vehicle and Traffic Law § 1163 [a]; *People v Ellis*, 62 NY2d 393 [1984]; *People v Ingle*, 36 NY2d 413 [1975].) Even if it is true, as defendant argues, that the anti-crime officers in this case were not looking to enforce the traffic laws, but were instead focused on finding evidence of criminal conduct, it was lawful for them to stop his vehicle when they observed the traffic infraction. (*See People v Robinson*, 97 NY2d 341 [2001].) As noted in *Robinson*,

> "[W]here a police officer has probable cause to believe that the driver of an automobile has committed a traffic violation, a stop does not violate article I, § 12 of the New York State Constitution. In making that determination of probable cause, neither the primary motivation of the officer nor a determination of what a reasonable traffic officer

would have done under the circumstances is relevant." (97 NY2d at 349.)

Once the police lawfully stop a motorist for a traffic violation, they may also require that he or she produce a license, registration and proof of insurance (*see e.g.* Vehicle and Traffic Law § 312 [1] [b]; § 319 [3]; § 401 [4]; § 507 [2]), and a driver who fails to produce the requested documents is presumed to be driving without them. (*People v Branigan,* 67 NY2d 860, 862 [1986].)

Here, the police gave defendant an adequate opportunity to produce the registration and proof of insurance, and they stopped him from continuing to search for those documents only when he became agitated, started to reach into the area behind the front seats and gave them a "hard stare." Although later inspection revealed that defendant's sports car is unusual in that, unlike most automobiles, it does not have a glove compartment in the front dashboard, the police had no reason to know this and were understandably concerned for their safety in light of defendant's seemingly odd conduct. As the circumstances of this traffic stop unfolded, it was entirely appropriate for Officer Ehrenreich to order defendant to stop reaching behind the car seats and to exit the vehicle. Indeed, the U.S. Supreme Court has recognized that routine stops for traffic violations are inherently dangerous to police officers, and for that reason, the police may lawfully direct a driver to exit the vehicle so that the traffic stop can be completed in full safety. (*Pennsylvania v Mimms,* 434 US 106, 110 [1977].) The same concerns that motivated Ehrenreich to direct defendant out of the vehicle also justify his brief pat down of defendant as he exited.

Once defendant was outside the vehicle, several factors—his agitated state, his inability to retrieve the paperwork after being given a reasonable opportunity to do so and his conduct in reaching into the darkened area behind the seats—presented the police with a dilemma. The officers' safety dictated that defendant not be allowed back into the car to continue his search, and defendant's interest in doing so only heightened that safety concern. While the police would have been justified in issuing defendant citations for violations of the Vehicle and Traffic Law, they also were entitled to confirm that defendant was operating the automobile with the permission of its owner before sending him on his way. (*See People v Philbert,* 270 AD2d 210 [1st Dept 2000].) It was therefore understandable and appropriate that

the police here made the common sense decision to attempt to retrieve the paperwork by going to the place directed by defendant.

The court is mindful that under the New York State Constitution, the police are not permitted to conduct a nonconsensual entry of an individual's automobile based solely on a traffic infraction. (*People v Class*, 67 NY2d 431 [1986]; *People v Aquino*, 119 AD2d 464 [1st Dept 1986].) Nonetheless, circumstances that develop during a lawful traffic stop of a vehicle may justify further police intrusion into the vehicle to conduct a limited search. (*See e.g. People v Branigan,* 67 NY2d 860, 862 [1986]; *People v Philbert, supra*; *see also People v Carvey*, 89 NY2d 707 [1997]; *People v Torres*, 74 NY2d 224, 231 n 4 [1989].) In *Branigan*, for instance, the police stopped the car the defendant was driving because it had a cracked windshield, void stickers and no front license plate. Although the police gave the defendant an opportunity to produce a license, registration and proof of insurance, the defendant could not do so. When the defendant then began acting "strangely," the police ordered him out of the vehicle for safety reasons (67 NY2d at 861). When they again asked for the paperwork, the defendant simply pointed toward papers on the front seat of the vehicle and said "in there" (*id.*). An officer then entered the car to look for the paperwork in the area directed by the defendant and saw the butt of a gun under the driver's seat. In upholding the police entry and search of the car, the Court of Appeals noted that for safety reasons the defendant could not have been permitted to look further for the required documentation and, in light of the "diminished expectation of privacy with respect to the contents of automobiles," the officer was justified in looking for the documents in the area specified by the defendant rather than having to arrest him. (*Id.* at 862; *accord People v Philbert, supra* [limited search for documents upheld where defendant could produce license, but no registration or proof of insurance].)

Here, the police were authorized to conduct a narrowly circumscribed search for the vehicle's paperwork in the area specified by defendant. The police had no viable, less intrusive alternative method of determining whether defendant lawfully possessed the vehicle and that it was properly insured, something they had every right to determine. Hovering over defendant with flashlights while defendant himself retrieved the documents in the cramped rear area of the two-seat sports car would have subjected the officers to an unreasonable and unnecessary

safety risk. Perhaps under different circumstances, involving a more typical vehicle with a more accessible, more readily visible front area glove compartment, or where there was evidence that the police had other less intrusive alternatives at hand, the limited search of the type that the police engaged in here would be impermissible. But under the unique circumstances of this case, the court concludes that the police properly prohibited defendant's reentry into the vehicle and instead lawfully entered the vehicle to conduct a limited search for the vehicle documents.

Once the police discovered the marijuana in plain view, they were permitted to seize it. The discovery of the marijuana also provided them with probable cause to believe the car might contain additional contraband and, under the automobile exception to the warrant requirement, they were entitled to search the car and any locked containers within it. (*See People v Blasich*, 73 NY2d 673 [1989]; *People v Langen*, 60 NY2d 170 [1983]; *People v Shabazz*, 301 AD2d 412 [1st Dept 2003].) Accordingly, the subsequent seizure of the firearm, firearm clip and bullets in the second glove compartment was also lawful.

As for the statements defendant made to the police, both at the scene and later at the precinct, defendant now candidly concedes they were voluntary (defendant's mem of law). In any event, although the police did not give *Miranda* warnings to defendant prior to his formal arrest, the statement he made at the scene—that the marijuana belonged to his brother—was not uttered in response to police questioning or any remark by the police designed to elicit an incriminating response. The *Miranda* warnings were therefore unnecessary. (*See People v Maerling*, 46 NY2d 289 [1978]; *see also Rhode Island v Innis*, 446 US 291, 301 [1980].) Similarly, the statement he made as he was being escorted after his formal interrogation at the precinct was a spontaneous response to Detective Moree's question to Officer Pengel regarding the type of gun seized. Defendant's response was not the result of any prompting by the police or any police questioning, and is therefore admissible. (*Id.*; *cf. People v Ferro*, 63 NY2d 316 [1984].) Finally, defendant's formal statement to Detective Pressley at the station house was made after defendant had been given the complete *Miranda* warnings. The court concludes that defendant knowingly and freely waived each of his rights and freely agreed to talk to the police before making that statement. That statement, therefore, is also admissible at trial.

For all of the above reasons, defendant's motion to suppress the firearm, the firearm clip with bullets, the marijuana and the several statements he made to the police is denied in its entirety.