People v Thibodeau (2018 NY Slip Op 04378)

People v Thibodeau

2018 NY Slip Op 04378 [31 NY3d 1155]

June 14, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 16, 2018

[*1]

The People of the State of New York, Respondent,
v
Gary Thibodeau, Appellant.

Argued April 26, 2018; decided June 14, 2018

People v Thibodeau, 151 AD3d 1548, affirmed.

APPEARANCES OF COUNSEL

Lisa A. Peebles, Federal Public Defender, Syracuse (James P. Egan and Mellisa A. Tuohey of counsel), for appellant.
Gregory S. Oakes, District Attorney, Oswego, for respondent.

{**31 NY3d at 1156} OPINION OF THE COURT

Memorandum.
The order of the Appellate Division should be affirmed.
Heidi Allen, an 18-year-old convenience store clerk, disappeared from her job shortly before 7:55 a.m. on Easter Sunday morning in 1994. She has not been seen or heard from since then. Defendant was convicted in 1995 upon a jury verdict of kidnapping in the first degree in connection with her abduction. The evidence at trial established that no more than 13 minutes had elapsed between the time when Allen, the only employee in the store, recorded the last sale in the cash register at 7:42 a.m., a sale of cigarettes to defendant's brother, Richard Thibodeau, and the time at 7:55 a.m., when a police officer called his dispatcher from the scene after being told by a customer that Allen was missing from the store. During that brief time period, an eyewitness observed two men and a woman in the parking lot of the convenience store, positioned outside of a distinctive "whitish blue" van, which the eyewitness subsequently identified as Richard's van. The eyewitness accurately described the van as having two black/dark blue doors in the rear and two similarly colored doors on the right side, as well as a six-inch-wide stripe across the center of the right rear panel. That eyewitness further testified that he observed one of the men restraining and struggling with the woman. A second eyewitness, who made the purchase that was registered at 7:41 a.m., one minute before Richard's transaction, also identified Richard's van as the van he saw in the{**31 NY3d at 1157} parking lot. This witness saw Richard enter the store and believed another man was inside the van with the engine running, outside the store. He also provided a partial license plate number that matched the plate on the Thibodeau van. Another witness identified Richard's van, noting the dark blue or black stripe on its side, as the "light blue" van that was "driving [*2]erratically" behind her on the morning of the kidnapping. Other evidence at trial established that defendant was with his brother earlier in the morning of the kidnapping and that Richard's van was parked at defendant's house shortly after Allen went missing. Moreover, there was testimony that defendant made several admissions to two fellow inmates while incarcerated on an unrelated matter, including that he and his brother drove Allen in Richard's van to the woods by defendant's house to talk to her that morning, but that they later purportedly returned her to the store. Defendant also told the inmates that Allen was killed with his shovel and mutilated. Defendant's conviction for kidnapping in the first degree[FN1] was affirmed on direct appeal (267 AD2d 952 [4th Dept 1999]).
In 2014, defendant moved to vacate the judgment of conviction based on an alleged Brady violation for a failure to disclose certain information and newly discovered evidence (CPL 440.10 [1] [g], [h]). After conducting a full evidentiary hearing, County Court detailed its findings of fact and conclusions of law and denied the motion. County Court found the Brady information had in fact been timely disclosed to defendant's attorney and that the alleged third-party admissions constituting the newly discovered evidence were inadmissible hearsay rather than declarations against penal interest. The Appellate Division affirmed, with one Justice dissenting (151 AD3d 1548 [4th Dept 2017]). The dissenting Justice granted defendant leave to appeal to this Court (29 NY3d 1136 [2017]).
"Although we are prohibited from weighing facts and evidence in noncapital cases, we are not precluded from exercising our 'power to determine whether in a particular judgmental and factual setting there has been an abuse of discretion as a matter of law' " (People v Jones, 24 NY3d 623, 630-631 [2014] [citation omitted]). We now hold there was no such error here and that defendant's CPL 440.10 motion was properly denied.
Defendant's claim of newly discovered evidence consisted of allegations that three men (James Steen, Roger Breckenridge{**31 NY3d at 1158} and Michael Bohrer) made extrajudicial admissions to their involvement in Allen's disappearance to different people in the passage of years after defendant's conviction for kidnapping. At the hearing of a motion to vacate the conviction, the "defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion" (CPL 440.30 [6]). On this record, the courts below determined that defendant failed to meet his burden and we cannot say, as a matter of law, that he presented newly discovered evidence "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]; see also People v Salemi, 309 NY 208, 215-216 [1955]).
At the hearing defendant called as witnesses all three declarants of the hearsay statements proffered as admissions against penal interests, as well as additional witnesses who testified to inculpatory statements alleged to have been made by each of the declarants. The declarants denied making the admissions and any complicity in Allen's kidnapping. Nevertheless, enabled by the speculative nature of the disparate admissions containing few details, defendant pursued more than one theory of complicity at the hearing—attempting to establish that, either singly or in combination, the declarants were involved in the kidnapping or the murder or the disposal of Allen's body (compare People v Tankleff, 49 AD3d 160 [2d Dept 2007]).
Contrary to defendant's argument on appeal, the courts below did not abuse their discretion in holding that, as to those witnesses who the court found credible, the hearsay testimony of third-party culpability was inadmissible at trial under the exception for declarations against penal interest. In order to be admissible under that exception,
"the following elements must be present: first, the declarant must be unavailable as a witness at [the hearing]; second, when the statement was made the declarant must be aware that it was adverse to his penal interest; third, the declarant must have competent knowledge of the facts underlying the statement; and, fourth, and most important, supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability" (People v Settles, 46 NY2d 154, 167 [1978] [emphasis added and citations omitted]).{**31 NY3d at 1159}
[*3]
"The rationale for allowing these statements, of course, stems from the assumption that a person would not ordinarily make a statement which jeopardizes his interest by subjecting himself or herself to criminal prosecution and incarceration. As with all generalizations, however, human motivation and personality renders the stated reason for permitting these declarations immediately suspect" (Settles, 46 NY2d at 168). Indeed, we recognized in Settles that "people may prevaricate" and that the possible reasons for such admissions "are limited only by the depth of human experience" (46 NY2d at 168). Where the defendant is attempting to introduce such a hearsay statement in his or her own defense, the reliability of the declarant's statement is demonstrated "if the supportive evidence 'establishes a reasonable possibility that the statement might be true' " (People v DiPippo, 27 NY3d 127, 137 [2016], quoting Settles, 46 NY2d at 169-170). Even under this lesser standard, however, the proffered evidence must still provide "persuasive assurances of trustworthiness" (Chambers v Mississippi, 410 US 284, 302 [1973]).[FN2] 
Assuming, without deciding, that the declarants were unavailable to testify within the meaning of Settles, notwithstanding their testimony at the hearing, the record supports County Court's determination that the independent corroboration necessary for admissibility of the declarations against penal interest was not sufficient. The requisite independent evidence circumvents fabrication and augments the trustworthiness of the declaration. "By imposing such a requirement[,] a balance is struck between the interest of defendant to introduce evidence on his own behalf and the compelling interest of the State to preserve the integrity of the fact-finding process in this aspect of criminal prosecutions" (Settles, 46 NY2d at 169). As we have explained, this determination of the reliability of proffered declarations against penal interest
"involves a delicate balance of diverse factors and is entrusted to the sound judgment of the trial court, which is aptly suited to weigh the circumstances{**31 NY3d at 1160} surrounding the declaration and the evidence used to bolster its reliability. The crucial inquiry focuses on the intrinsic trustworthiness of the statement as confirmed by competent evidence independent of the declaration itself" (Settles, 46 NY2d at 169; see People v Shortridge, 65 NY2d 309, 313 [1985]).
Defendant's attempt to adduce some independent evidence at the hearing in order to secure a new trial proved unavailing. In contrast to the evidence presented at trial, there was no independent credible evidence at the hearing that any of the declarants were at or near the scene of Allen's kidnapping that morning, let alone in the limited window of time left open by the trial evidence. There was not even any credible evidence the declarants owned a van.[FN3] In fact, the evidence failed to demonstrate that Steen and Breckenridge even knew Bohrer at the time of the offense.
The speculative link between the declarations and Allen's kidnapping was evidenced when defendant presented a witness, Richard Murtaugh, whose family owned a local scrap processing facility and who knew both Steen and Breckenridge in 1994. Murtaugh testified that while defendant was incarcerated in this matter he and [*4]Breckenridge removed an inoperable van from defendant's property and "scrapped" the vehicle. Breckenridge likewise testified that he and Murtaugh had removed the van from defendant's property after Allen was kidnapped. Although the men apparently discussed the possibility that this particular van could have been used by the Thibodeaus to abduct Allen, Murtaugh concluded based on his own search of the van that Allen's body was "[a]bsolutely not" inside the vehicle. Steen also testified that in his employment as a driver for a business that transported scrapped vehicles to Canada, he did business with Murtaugh. Breckenridge told Steen that a van Steen had "scrapped" in Canada was connected to Allen's kidnapping, thereby implying that Steen had unwittingly been involved in disposing of the body in Canada. While interesting, this testimony does not provide any independent support for the declarations attributable to Steen or Breckenridge that they were involved in the kidnapping or the disposal of the body in Canada.{**31 NY3d at 1161}
Similarly, the attempt to produce independent evidence to corroborate declarations that Allen was taken to a certain cabin following her abduction failed as well. As the Appellate Division pointed out, the fact that cadaver dogs alerted to the possible presence of human remains near a "collapsed structure" in the woods two decades after the crime does not provide the corroboration necessary to ensure the reliability of such a speculative theory. Indeed, a forensic examination conducted at the site by the Medical Examiner's Office yielded no evidence of human remains and this scientific result was roundly supported by the hearing testimony that the structure was already partially or totally collapsed at the time of the crime in 1994, which was inconsistent with the alleged admissions. Moreover, given the absence of the requisite independent corroboration of the hearsay evidence, the "sheer number" of the statements proffered did not, in itself, establish trustworthiness as a matter of law, particularly considering the conflicting and varied nature of the claimed admissions.[FN4]
Nor did defendant's invocation of the criminal histories of the declarants provide the requisite corroborative evidence. Specifically, the reverse Molineux evidence of Bohrer's prior{**31 NY3d at 1162} convictions was properly excluded because the similarities of his prior crimes and the kidnapping of Allen were not sufficiently unique to establish a particular modus operandi or to identify any one person (see DiPippo, 27 NY3d at 138-139; People v Beam, 57 NY2d 241, 251 [1982]). Our conclusion would be the same even if we were to adopt a "more relaxed standard" for exculpatory evidence submitted on the defendant's behalf (compare DiPippo, 27 NY3d at 139).
There is also record support for the affirmed finding that certain witnesses—whose live testimony was subject to full examination and evaluated by the hearing court, allowing for fair consideration of such factors as motivation and recollection—were simply not credible. County Court clearly did not engage in any mechanical or categorical rejection of the witnesses' testimony (compare Tankleff, 49 AD3d at 181). The court's rejection of the internally inconsistent and contradictory testimony of William Pierce, as patently unreliable for a myriad of reasons, was supported by the record. As to the hearsay statement of Tonya Priest, her self-serving motivations and inconsistencies were weighed by the trier of fact and her credibility as an affiant was "significant[ly] doubt[ed]" by the courts below, which noted that she was never called to testify at the hearing by the defense, thereby preventing any opportunity for cross-examination and a full vetting of her veracity. In this regard, Priest's allegations were not corroborated by any independent evidence and hearing proof contradicted her allegations in several respects. Finally, County Court reasonably excluded Jennifer Wescott's recorded telephone conversation as hearsay not subject to any identifiable hearsay exception. Significantly, County Court observed that Wescott testified at the hearing that her statements in the recorded call were untrue.
The dissent, while acknowledging this Court's jurisdictional inability to disturb the credibility determinations of the hearing court, nonetheless engages in a de novo and rather skewed analysis of the weight of the evidence at both the trial and the hearing in favor of defendant's search for a plausible hypothetical to interject his theory of a second van (see People v Calabria, 3 NY3d 80, 83 [2004]). Contrary to the dissent's postulation, the aggregation of unreliable hearsay does not alter the character of the evidence to provide independent assurances of reliability.
In short, considered as a collective whole, defendant's newly discovered evidence was comprised of uncorroborated hearsay{**31 NY3d at 1163} that the hearing court was entitled to reject, within its discretion, as untrustworthy in nature and inadmissible at a trial based on its assessment of witness credibility and factual findings. Consequently, once the hearing court was convinced, upon the testimony of the witnesses and the controlling law governing hearsay evidence, that the newly discovered evidence was inadmissible at trial and therefore not of a character that would have resulted in a verdict more favorable to defendant, it "was not at liberty to shift upon the shoulders of another jury [its] own responsibility" (see People v Shilitano, 218 NY 161, 180 [1916, Cardozo, J., concurring]).[FN5]
Finally, defendant's Brady claim lacks merit.

Rivera, J. (dissenting). Defendant Gary Thibodeau has been incarcerated for over two decades—almost a third of his life—for the kidnapping of a young woman who disappeared one morning and was never seen again. No physical or forensic evidence connected defendant to the abduction, and no witness ever identified defendant as the kidnapper or placed him at the scene where the victim was taken. Nor has defendant confessed to having committed the crime; rather, he has always maintained his innocence. He now asserts that newly discovered evidence points to three men who have admitted to abducting and murdering the victim. Turning to the state courts, defendant asks for an opportunity to present this third-party culpability evidence to a jury, which would once again decide his fate. I believe the law affords him such opportunity.
County Court decided otherwise and denied defendant's CPL 440.10 motion to vacate his conviction. Over a vigorous and compelling dissent, a split Appellate Division panel affirmed (People v Thibodeau, 151 AD3d 1548 [4th Dept 2017]). A majority of our Court now affirms the Appellate Division order, agreeing with the courts below that the evidence defendant seeks to present is not credible or corroborated. I disagree and would reverse and order a new trial, because defendant presented admissible evidence at the hearing that is "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]). The majority's assertion that the{**31 NY3d at 1164} confessions are uncorroborated does not stand up to scrutiny: in addition to the various pieces of corroborative evidence, "[t]he sheer number of independent confessions provide[s] additional corroboration for each" (Chambers v Mississippi, 410 US 284, 300 [1973]).
I.
A. Defendant's Prosecution
The People separately tried defendant and defendant's brother, Richard, for the kidnapping of the 18-year-old victim. Richard was initially arrested and charged alone approximately one month after the disappearance. He admitted to being at the store with his van during the time the People proposed the victim was kidnapped, and there was evidence of a store receipt for the purchase of cigarettes at 7:42 a.m., around the time the victim disappeared, which the People established were bought by Richard. The police later decided that defendant and Richard acted together and indicted defendant, notwithstanding the alibi provided by defendant's girlfriend, who stated that they were together at defendant's home the morning of the crime.
The People's narrative as presented at defendant's trial was that defendant and Richard kidnapped the victim between 7:41 a.m. and 7:45 a.m. on Sunday, April 3, 1994, outside a convenience store where she worked, and put her in Richard's van, which defendant then drove away from the scene. The People presented no physical, forensic, or [*5]motive evidence to support defendant's involvement. Instead, the only evidence connecting defendant to the crime was testimony about the general appearance of one of the kidnappers—a description that matched defendant's appearance—and testimony from two inmates concerning comments defendant allegedly made about the victim while the three were briefly incarcerated together, though none of those comments constituted confessions to either kidnapping or murder.
One witness, John Swenszkowski, who made a purchase at the store at 7:41 a.m., testified that he saw a "pretty beat up van" with "a lot of rust" parked outside the store. He could not recall the color of the van. Upon leaving the store, Swenszkowski testified that he saw a man enter, whom he described as between 5 feet 6 inches and 5 feet 7 inches, 145 pounds with a mustache. It is undisputed that this description fit Richard's{**31 NY3d at 1165} appearance at the time. Swenszkowski further testified that, after over a minute had passed (during which he was settling into his car), he saw the van move forward several feet and stop. The People argued this established defendant was in the van while Richard was in the store.[FN1] Swenszkowski did not claim to have witnessed the kidnapping. He did not testify to seeing Richard interact with the victim, nor to seeing anyone place the victim into the van outside. Indeed, he never stated that he saw defendant at, or anywhere near, the store.
Another witness, David Stinson, testified that he arrived at the store at about 7:41 a.m. He did not see the victim or any other vehicle in the store parking lot. He flagged down an officer who sent a notice at 7:55 a.m. about the victim's disappearance. The officer found no signs of a struggle inside the store.
The only witness who claimed to see anyone interacting with the victim in the convenience store parking lot on the day of her disappearance was Christopher Bivens. Five days after the disappearance, Bivens told the police that as he drove by the store between 8:00 a.m. and 8:30 a.m. on the day of the abduction, he saw two men and a woman arguing outside the store, near a vehicle, although he could not give a description of either the people or the vehicle. Ten days later—not long after a reward was posted—Bivens again spoke to the police. This time, he said that the van was light blue with dark trim. Richard's van was white, with black doors and a black stripe, and was rusted in certain places. Two days later, the police drove Bivens past Richard's van and Bivens told them the van's style matched, but that the color was wrong. The next day the police showed Bivens a photograph showing the side and back doors of Richard's van, and again Bivens stated that Richard's van was not the one he saw at the store. When the police then showed him a photograph of the van's black side doors, Bivens said he was still uncertain. The following day, for a third time, the police showed Bivens pictures of Richard's van. At that point, Bivens identified the van as the one he saw the day the victim was abducted.
At trial, Bivens testified that the woman he saw was the victim, one of the two men he saw was holding her in a bear hug, and the other man was walking towards the van. He{**31 NY3d at 1166} described both men as 30 to 40 years old, 5 feet 11 inches, with husky builds, and the van as having a painted-on stripe and spots of rust. Other testimony established that defendant was between 5 feet 8 inches and 5 feet 10 inches, and 150-190 pounds.
Nancy Fabian testified that at approximately 7:45 a.m., a van came up fast behind her, swerving back and forth. She saw a white male with dark hair and what appeared to be a beard and mustache driving while using his right arm to control something in the back of the van. Even though the abduction occurred in April, she reported this in June. Nancy had only been able to see the front of the van through her rearview mirror, and first described it as light blue with something in the middle, possibly a stripe. She then identified Richard's van from a photograph as the vehicle she saw that morning.
Prior to his arrest for the victim's kidnapping, defendant was arrested on an unrelated offense. At trial, two inmates who had been at the same out-of-state facility as defendant testified to statements he made regarding the victim's abduction, including that he knew the victim was dead and would not be found, that her head was bashed in with a shovel, and that, because there was no struggle at the store, she must have known the abductors. Defendant also allegedly stated that he and Richard spoke to the victim regarding a disagreement over a drug deal and drove her [*6]to the woods near his house to talk, after which Richard drove her back to the store. When Richard later went to the store, she was gone. According to these inmates, defendant would hear about the progression of the investigation from his brother and would pass details on to them. The two inmates never testified that defendant admitted to the victim's abduction, or to causing her any harm. On the contrary, their testimony amounted to defendant having last seen her alive and well, on her way back to the store.[FN2]
Richard testified on behalf of defendant that he saw the news about the abduction the same day and called the police. Within a week, Richard had consented to a search of his van, which the police examined comprehensively. Carpeting from the van was analyzed by an FBI lab, but no blood was found, and the hairs and fibers collected did not match the victim, nor did the{**31 NY3d at 1167} fingerprints found in the van. A forensic scientist testified at trial that if there had been a struggle—as had been suggested by the People's evidence—it was likely that there would have been some transfer of microscopic material from the victim to the van. No such material, however, was found. Finally, impressions of the van's tires did not match the impressions of tire marks found directly in front of the store, where multiple witnesses testified they had seen a van and where Bivens testified he had seen the victim abducted.
As with the testing of Richard's van, there was extensive analysis of defendant's home, and no evidence of the crime was found there either. The police and FBI's search and analysis of items from the house turned up no evidence linking defendant to the victim. This was not for lack of trying: material from defendant's furnace was tested and found to contain no evidence; bone fragments in a pile of soot were examined but proved not to be of human origin; and knives, saws, and a shovel were tested and found to contain no trace of the victim.
Defendant took the stand in his defense and testified that he was at his home with his girlfriend from late Saturday night through Sunday evening. Shortly after 10:00 a.m. on Sunday he received a call from Richard. His girlfriend, with whom he lived, testified to the same. Although three witnesses testified that Richard's van, or a van that matched its description, was at defendant's residence the morning of the victim's disappearance, defendant testified that he had no contact with his brother that day, and two of defendant's neighbors stated that they did not see or hear Richard's van at defendant's home that morning. Regarding the inmates' testimony, defendant acknowledged that he would receive updates from his brother about the investigation while in jail and would relay information from those conversations to the two men.
The jury returned a guilty verdict, and defendant's conviction was affirmed on appeal (People v Thibodeau, 267 AD2d 952 [4th Dept 1999], lv denied 95 NY2d 805 [2000]). Defendant's federal habeas corpus petition, which challenged the constitutionality of New York's first-degree kidnapping statute on vagueness grounds, was denied (Thibodeau v Portuondo, 486 F3d 61 [2d Cir 2007]). Following defendant's conviction, a separate jury acquitted Richard, despite his admission to making the last purchase at the store before the victim's disappearance.{**31 NY3d at 1168}
B. Defendant's Post-Conviction 440.10 Motion
Years later, defendant learned of new evidence that supported his claim of innocence. Defendant moved to vacate the judgment pursuant to CPL 440.10 (1) (b) and (h) on the ground that the People suppressed Brady material, specifically evidence of the victim's status as a police confidential informant, and under CPL 440.10 (1) (g) on the ground of newly discovered third-party culpability evidence that would have resulted in a more favorable verdict to the defendant. Defendant presented evidence that three men, Michael Bohrer, James Steen, and Roger Breckenridge, abducted the victim from the store in Bohrer's van, killed her, and disposed of her body by cutting it up and sending it to Canada in a vehicle being scrapped. The evidence consisted of testimony by a multitude of witnesses to these three men's inculpatory statements, as well as documents that corroborated their guilt and defendant's innocence.
Defendant presented an affidavit that Tonya Priest provided to the police in 2013 claiming that in 2006, Steen vividly described to her and her friend how he, Bohrer, and Breckenridge abducted and murdered the victim. The police subsequently recorded a conversation between Priest and Jennifer Wescott, who was Breckenridge's girlfriend [*7]for years after the abduction, and the call was presented at the hearing. Unaware that the call was being monitored, Wescott stated that Bohrer, Steen, and Breckenridge brought the victim to Breckenridge's house in a van, against the victim's will, but Wescott did not implicate herself in the crime. Wescott claimed to have had an argument with Steen over the fact that there was an "innocent man in prison," and said that she could not talk to Priest about what the men did because "they scared [her]."
At the hearing on the motion, defendant presented additional testimony by various witnesses implicating Bohrer, Steen, and Breckenridge in the abduction, including confessions by these three to the victim's abduction and murder. Regarding Bohrer, one person testified that, having just met Bohrer in a bar one night, Bohrer confided, "the Thibodeaus . . . they're not the ones that did it," "I know who did it," and "I know the whereabouts of [the victim's] body." According to the witness, Bohrer was sobbing and continued that he had "been dealing with this too long" and "didn't want to deal with it any more (sic)." Another witness, a former coworker of Bohrer's, testified that he had told her and her sister that "he would do [them] like he did [the victim]."
{**31 NY3d at 1169}Another four people testified to having heard Steen make similar incriminating comments. According to Amanda Braley, she was at a party with Steen and heard him say "I will never see a day in prison for what we did to [the victim]." The other three witnesses testified that they had heard Steen make various inculpatory statements, including: "the actual van that was used in her kidnapping, [mine's] the one that hauled it to Canada and had it scrapped," that "[the victim] was a rat," that "I showed you what I did with [the victim]," "[l]ook at what happened to [the victim]," "[s]he's long gone now," "[s]he's gone to Canada," "I know more about this . . . case than the Oswego County Sheriff's [sic], they got the wrong guys," and that "[t]hey got the Thibodeaus in there, and the Thibodeau boys didn't do it."
Braley and four other people testified that Breckenridge had either discussed murdering the victim outright or made other inculpatory remarks in their presence. Braley disclosed that at a different social gathering, Breckenridge said "he took that bitch to the scrap yard in the van, they had it crushed, and that she was shipped to Canada," and "nobody's ever going to find her." Christopher Combes described how, when he worked with Breckenridge in the early 2000s, Breckenridge told him, "[w]e chopped her up, we put her in a wood stove and put her in a vehicle and sent her to Canada." Another three witnesses related similar statements by Breckenridge, including "the bitch ain't going to be found," "[s]he's a rat," "[i]t's a waste of [the] government's time to be finding her," "she was going to break him on selling drugs," and "that [bitch] is long gone."
At the hearing, Wescott testified that Breckenridge told her he knew the victim was burned in a stove and "taken care of" in a van. Defendant also presented evidence from the renewed police investigation—including from the location where the men had reportedly killed the victim—which tended to confirm many of the key details of these confessions.
On consent of defendant and the prosecutor, Bohrer, Steen, and Breckenridge testified at the hearing. All three men generally denied making the incriminating statements. Nevertheless, Steen acknowledged that he hauled scrap materials in 1994 for Richard Murtaugh, sometimes to Canada, and that he knew Breckenridge and Wescott. Steen testified that he did not know what happened to the victim's remains, but that if he did know, he would not tell. He started discussing that he may have "unknowingly" destroyed the victim's body in the white {**31 NY3d at 1170}van when the court cut him off for reasons unknown. Breckenridge testified that he started dating Wescott on her eighteenth birthday in 1995, was friends with Steen, worked for Murtaugh in 1994, and worked with Bohrer once but did not know him in 1994. He also said neither he nor Wescott ever lived on Rice Road. Bohrer testified he had just started working at Murtaugh's junkyard at the time of the victim's disappearance, did not know Steen, and then, rather incoherently, claimed that he was "looking into" the victim's death. The court gave him a break to compose himself because he became upset during his testimony.
After the hearing, the court denied defendant's motion for a new trial. As to the third-party culpability evidence, the court concluded that Pierce's identification of Steen was not credible, Wescott's admissions to Priest during the recorded phone call were not reliable and therefore inadmissible, and that the hearsay confessions by Steen, Breckenridge, and Bohrer were not sufficiently corroborated for admission as statements against penal interest. The Appellate Division affirmed the denial of the motion, with one Justice dissenting (Thibodeau, 151 AD3d 1548). The dissenting Justice granted defendant leave to appeal (29 NY3d 1136 [2017]).
[*8]II.
A. Defendant's Burden on the CPL 440.10 (1) (g) Motion
Pursuant to CPL 440.10 (1) (g), a court may vacate a judgment of conviction on the grounds that "[n]ew evidence has been discovered . . . [that] could not have been produced by the defendant at the trial . . . and which is of such character as to create a probability that . . . the trial . . . verdict would have been more favorable to the defendant." The defendant has the burden of establishing "by a preponderance of the evidence every fact essential to support the [440] motion" (CPL 440.30 [6]; see also People v Jones, 24 NY3d 623, 636 [2014]).
We have stated that denials of CPL 440.10 (1) (g) motions without a hearing are reviewed for abuse of discretion (see People v Wright, 27 NY3d 516 [2016]; People v Gross, 26 NY3d 689 [2016]; Jones, 24 NY3d at 630). While this Court has not explicitly said so, it follows that a denial after a hearing should also be reviewed under that same standard, "which involves a legal, rather than factual, review" (Jones, 24 NY3d at 629 [drawing upon the history of CPL 440.10 to determine that{**31 NY3d at 1171} this Court should review for abuse of discretion]). As such, this Court may not find facts or make credibility determinations, and so to the extent the lower court based its decision on a factual or credibility finding, we are foreclosed from review, unless there is no record support for the determination (see People v Lee, 29 NY3d 1119, 1120 [2017]). Nevertheless, as stated in Jones:
"Although we are prohibited from weighing facts and evidence . . . we are not precluded from exercising our power to determine whether in a particular judgmental and factual setting there has been an abuse of discretion as a matter of law because, in so doing, we are not passing on facts as such, but rather considering them to the extent that they are a foundation for the application of law" (24 NY3d at 630-631 [internal quotation marks and citation omitted]).
A finding that, as a matter of law, certain evidence is inadmissible is reviewable.
I agree with the majority that there is no error attributable to the hearing court's determinations that one witness, William Pierce, was not credible and the evidence of Bohrer's past crimes was inadmissible.[FN3] That is where my agreement ends, as I disagree with the entirety of the majority's analysis regarding the admissibility of Bohrer, Steen, and Breckenridge's inculpatory statements. Contrary to the majority's conclusion, those statements were adequately corroborated and "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]).
B. Admission of Statements against the Declarants' Penal Interest
An out-of-court statement introduced to prove the truth of the matter asserted constitutes hearsay, though it may be admissible if it falls within a hearsay exception and the proponent demonstrates its reliability (see People v Brensic, 70 NY2d 9, 14 [1987]; McCormick on Evidence § 246). One such {**31 NY3d at 1172}exception is a statement against the declarant's penal interest (see Brensic, 70 NY2d at 14), because "a person ordinarily does not reveal facts that are contrary to [such person's] interest" (People v Maerling, 46 NY2d 289, 295 [1978]). "Declarations against interest are not admitted on the credit of their makers, but on their highly disserving nature," and when it comes to statements against penal interest, "[o]ne thing is clear: the severe sanctions potentially attendant upon a conviction for crime, whether by way of imprisonment or fine or both, make admissions of guilt among the most disserving of declarations" (id. at 297-299).
This Court has developed four criteria to guide a judge "in reaching a conclusion that the assurances of truthfulness of a particular statement are adequate or inadequate to warrant admission" (id. at 298). We have explained:
[*9]"[t]o qualify for admission into evidence as a declaration against the [declarant]'s penal interest the following elements must be present: first, the declarant must be unavailable as a witness at trial; second, when the statement was made the declarant must be aware that it was adverse to [their] penal interest; third, the declarant must have competent knowledge of the facts underlying the statement; and, fourth, and most important, supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability" (People v Settles, 46 NY2d 154, 167 [1978] [citations omitted]).
The last criterion requires "some evidence, independent of the declaration itself, which fairly tends to support the facts asserted therein" (id. at 168). "Supportive evidence is sufficient if it establishes a reasonable possibility that the statement might be true" (id. at 169-170). Even "[c]ircumstances of seeming indifference may still harmonize the declarant's statement so as to furnish the necessary link" (id. at 169).
When assessing the sufficiency of the supportive evidence, courts must consider the critical rule that "declarations that exculpate the defendant . . . are subject to a more lenient standard" (People v Soto, 26 NY3d 455, 462 [2015], citing Brensic, 70 NY2d at 15). In such cases, the independent evidence is subject to a less demanding threshold such that "a defendant need not show that the penal consequences to the declarant were of such magnitude that they 'all but rule out any motive {**31 NY3d at 1173}to falsify' " (id., quoting Brensic, 70 NY2d at 15, citing Maerling, 46 NY2d at 298). The reason for this relaxed standard is best understood in contrast to the heightened burden for statements that inculpate a defendant:
"In a criminal case, reconciliation of the search for truth with concern for fairness to the defendant must proceed with great care. And, where the declaration is inculpatory in character, scrutiny of its reliability should, if possible, be even more circumspect because of the due process protections afforded those charged with crime, including, of course, the requirement that guilt be proved beyond a reasonable doubt" (Maerling, 46 NY2d at 298).
The concerns attendant to inculpatory statements do not logically extend to declarations that exculpate a defendant, and therefore the reliability of the statement need only meet a "more lenient standard" (see Soto, 26 NY3d at 462).
As to the proper exercise of judicial discretion in deciding whether to admit the statement, the court must not weigh in the balance either its own opinion of the declaration's truth or the People's ability to persuade the jury of defendant's guilt. "Whether a court believes the statement to be true is irrelevant, and the question of admissibility is to be resolved without regard to the seeming strength or weakness of the People's case" (Settles, 46 NY2d at 170). Once a proponent establishes the "possibility of trustworthiness, it is the function of the jury alone to determine whether the declaration is sufficient to create reasonable doubt of guilt" (id.).
C. Third-Party Confessions of Michael Bohrer, James Steen, and Roger Breckenridge
1. Declarants' Disavowal of the Statements
The majority here assumes without deciding that the first criterion, which requires that a declarant be unavailable, presents no barrier to the admissibility of a statement against penal interest when the declarant takes the stand and denies having made the statement (majority op at 
1159). I would adopt this position as a matter of law, because, where the other three criteria are met, admission of the statement protects defendant's constitutional rights, furthers our legal system's truth-seeking function, and comports with the underlying reasons for the hearsay exception.{**31 NY3d at 1174}
Rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve" (United States v Scheffer, 523 US 303, 308 [1998] [internal quotation marks omitted]). "[T]he exclusion of evidence [is] unconstitutionally arbitrary or disproportionate" when it "infringe[s] upon a weighty interest of the accused" (id.). Accordingly, application of this hearsay rule so stringently as to deny a defendant's right to present a defense would violate the Constitution (see Chambers, 410 US at 294 [discussing exclusion of hearsay that served as crucial third-party culpability evidence, inter alia, as a denial of "(t)he right of an accused in a criminal trial to due process(, which) is, in essence, the right to a fair opportunity to defend against the State's accusations"]).
[*10]
Another rationale for admitting statements against penal interest despite declarants' availability is the opportunity to subject the declarants to cross-examination, the method by which the statements' "reliability can best be determined" (Crawford v Washington, 541 US 36, 61 [2004]). Indeed, as the Third Department recognized in People v Oxley, "the ability to challenge [out-of-court statements against penal interest] through cross-examination when the witness testifies provides a better opportunity to test or assure their credibility" than if the declarant did not testify (64 AD3d 1078, 1084 [3d Dept 2009]). Since Bohrer, Steen, and Breckenridge would be subject to cross-examination about their statements, the reliability of the alleged, inculpatory remarks would be put to the test.
Other jurisdictions also admit third-party statements against penal interest where the declarants have testified and denied the statements. In Hines v Commonwealth, for example, the Supreme Court of Virginia stated, "if [a declarant] were present and testifying, but denying that [they] made any such confession, then [their] own original testimony would not be available, and it would be competent and proper to introduce proof of the alleged confession by others who heard it, and let the jury determine as to the credibility of the testimony" (136 Va 728, 745, 117 SE 843, 848 [1923]). The Supreme Court of California has similarly noted that the search for the truth is best served by confronting the declarant with the statements (see People v Spriggs, 60 Cal 2d 868, 875, 389 P2d 377, 381 [1964] ["If (the declarant) was available . . . the credibility of (their) extrajudicial statements would not be lessened by that{**31 NY3d at 1175} fact. Furthermore, the opportunity for cross-examination would eliminate the basic objection to the hearsay character of the evidence"]). The Supreme Court of Oregon has cogently reasoned that prohibiting admission of the statements would be detrimental to finding the truth and incentivize fabricated statements, which the hearsay rule is intended to weed out.
"[T]he unavailability of a declarant who has allegedly confessed to the crime would not make [the] hearsay testimony more reliable—it would make it less reliable. If the hearsay declarant is available, as here, the declarant can take the stand and clarify or refute the confession that [the declarant] allegedly made. If the declarant is unavailable, however, no such opportunity exists. Indeed, the unavailability of the declarant actually would help witnesses concoct falsified 'confessions' by absent third parties, because they would know that the missing declarant will not be around to deny their claims" (State v Cazares-Mendez, 350 Or 491, 519, 256 P3d 104, 119 [2011]).
The United States Supreme Court's analysis in Chambers is instructive. There, the Court held a third-party confession admissible, notwithstanding the hearsay rule. The Court noted that "if there was any question about the truthfulness of the extrajudicial statements, [the other suspect] was present in the courtroom and was under oath. [That third party] could have been cross-examined by the State, and his demeanor and responses weighed by the jury" (Chambers, 410 US at 301).
"[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice" (id. at 302). Just so here, where excluding statements made by Bohrer, Steen, and Breckenridge would deprive defendant of his right to a fair trial by keeping evidence of defendant's possible innocence and third parties' guilt from the jury. Thus, if defendant satisfies the other criteria for admission of a statement against penal interest, the declarants' willingness to testify and deny making inculpatory statements does not bar the admission of those statements.
2. Declarant's Awareness of the Disserving Nature of the Statements and Knowledge of 
 the Underlying Facts
As to the second criterion, all the statements evince the respective declarant's awareness that the statements were{**31 NY3d at 1176} against their penal interest when made, because all the statements admitted the declarant's participation in the disappearance of the victim, baldly pronouncing that they abducted and murdered her. Braley testified that "[Breckenridge] laughed . . . and he said that he took that bitch to the scrap yard in the van, they had it crushed, and that she was shipped to Canada . . . nobody's ever going to find her." She also testified to hearing Steen brag, "I can . . . tell you I will never see a day in prison for what we did to [the victim]." The man who had encountered Bohrer in a bar testified that Bohrer explained, "[the Thibodeaus are] not the ones that did it. He says I know who did it and I know the whereabouts of [the victim's] body." The declarants could not have misunderstood or been uncertain that "criminal liability would attach" based on their role in the victim's kidnapping and killing (Settles, 46 NY2d at 168). [*11]Moreover, all three had knowledge of the particulars of their conduct in furtherance of the crime, satisfying the third criterion for admission of their statements.
3. Independent Evidence of a Reasonable Possibility the Statements are True
With respect to the last criterion that "there must be some evidence, independent of the declaration itself, which fairly tends to support the facts asserted therein" (Settles, 46 NY2d at 168), this assessment depends on the nature of the statement. As we explained in People v DiPippo, "[w]hen considering the reliability of a declaration, courts should also consider the circumstances of the statement . . . . Where . . . the statement is offered by the defendant, this element is satisfied if the supportive evidence 'establishes a reasonable possibility that the statement might be true' " (27 NY3d 127, 137 [2016], quoting Settles, 46 NY2d at 169-170).
Here, contrary to the majority's reference to the testimony as a "speculative theory" lacking any independent support (majority op at 
1161), defendant presented an exhaustive amount of corroborating evidence for the confessions.[FN4] First, while the hearing court said that the three declarants did not know each{**31 NY3d at 1177} other, evidence demonstrated that they all worked for or did business with Richard Murtaugh, for whom Steen hauled scrap to Canada.[FN5] This evidence linked the three declarants to each other and to the abduction, and supports the reliability of the confession that the body was taken to Canada.
[*12]
Second, defendant provided corroboration for the affidavit he sought to introduce from Priest, which described how Steen had told her in 2006 that he, Bohrer, and Breckenridge brought the victim to Breckenridge's house on Rice Road, at which Wescott was present, and that the three men took turns beating the victim to death, cut up her body, hid her under floorboards in a cabin in the woods, and burned her clothes in a wood stove in the same cabin. Defendant's evidence established that there was a dilapidated cabin at the location described. In July 2014, investigators responded to a report by the current resident of the house—who stated that she had seen two people emerge from the woods where the cabin is located the previous night—and noted the "collapsed" cabin appeared to have been "sifted through." Three cadaver dogs subsequently indicated the cabin had the scent of human remains.[FN6] Moreover, a witness at the hearing testified that Wescott lived on Rice Road at the time of the crime; there was,{**31 NY3d at 1178} however, conflicting testimony on this point. Steen had also told Priest that Wescott moved to Florida after the police began searching behind Breckenridge's house. In her recorded phone call with Priest, Wescott stated she and Breckenridge moved to Florida after the victim's death, consistent with Steen's narrative. Wescott also wrote the following messages to friends during the recent investigation: "If anyone ask[s] you I never went to [F]lorida when [the victim] went missing and I never lived on [R]ice [R]oad[—]don't tell them anything!" and "[I] will not be the next one dead in a box in the woods." A post office report from that time noted that Bohrer also left town for a few weeks starting on Easter of 1994. The police would later find a box of memorabilia regarding the victim's case in his home.
The majority writes that "there was no independent credible evidence at the hearing that any of the declarants were at or near the scene of 
Allen's kidnapping that morning" (majority op at 1160). Yet, "we have never held that there must, in every case, be proof directly linking the third party to the crime scene; indeed, we have recently held that, in certain circumstances, third-party culpability evidence may be admitted absent such direct evidence" (DiPippo, 27 NY3d at 136).
Defendant also provided corroborative motive evidence: police files showing the victim was a confidential informant helping with drug investigations, evidence that Steen and Breckenridge were involved in drug use or sales, and testimony by four people who heard Breckenridge or Steen make related comments, such as that the victim "was going to break [them] on selling drugs." In addition, a police deputy had accidentally left the victim's confidential [*13]informant index card and photograph in a parking lot in front of the D&W store from which she was later abducted. Bohrer's notes indicated he knew the victim's card had been found in the lot, despite the card's disappearance never having been made public. The foregoing evidence is, in accordance with Settles, "some evidence . . . [that] fairly tends to support the facts asserted therein," and thus "establishes a reasonable possibility that the statement[s against penal interest] might be true" (Settles, 46 NY2d at 168-170). {**31 NY3d at 1179}Therefore, the statements against penal interest are admissible.
That conclusion is strengthened when the evidence is considered in its totality and in context. "When considering the reliability of a declaration, courts should also consider the circumstances of the statement, such as, among other things, the declarant's motive in making the statement—i.e., whether the declarant exculpated a loved one or inculpated someone else, the declarant's personality and mental state, and the internal consistency and coherence of the declaration" (DiPippo, 27 NY3d at 137 [internal quotation marks and citation omitted]). Notably, several witnesses have testified to statements by these three declarants that not only implicate them in the victim's disappearance, but constitute admissions of guilt of kidnapping and murder. Some of the statements supported the others, such as the descriptions of the van, the destruction of the victim's body in a cabin, and statements regarding the victim's body being taken to Canada. Those statements should be assessed by a jury "to determine whether the declaration[s are] sufficient to create reasonable doubt of guilt" (Soto, 26 NY3d at 462, quoting Settles, 46 NY2d at 170). To the extent some of the witnesses' testimony constitutes otherwise-inadmissible hearsay, that testimony may nonetheless serve as corroboration for admissible statements such as the confessions introduced through Braley, Combes, and Priest (see DiPippo, 27 NY3d at 138 [including some hearsay among the evidence that satisfied the Settles test]).
Moreover, the singular driving concern of the hearsay rule—to avoid admission of fabricated evidence—is not present here. There is no evidence that the witnesses concocted these powerful third-party statements of guilt for defendant's benefit, nor of a motive for the declarants to inculpate themselves in a kidnapping and murder or exculpate defendant (compare with People v Shortridge, 65 NY2d 309 [1985]). The witnesses are a variety of ages, occupations, and levels of closeness to the three declarants. The incriminating statements themselves are also varied. At times, the declarants explained what had occurred. For example, an old friend of Steen's testified that Steen mentioned his van was "the one that hauled [the actual van that was used in (the victim's) kidnapping] to Canada and had it scrapped," and Braley testified that Breckenridge declared "he took that bitch to the scrap yard in the van, they had it crushed, and that she was shipped to Canada." Other {**31 NY3d at 1180}times, the statements were made as a blatant commentary that the declarant was immune to prosecution because the victim would never be found and the wrong persons—the Thibodeau brothers—were blamed for the crime. Among such comments, someone for whom Steen used to work testified that Steen said, "I know more about this . . . case than the Oswego County Sheriff's [sic], they got the wrong guys," and that "[t]hey got the Thibodeaus in there, and the Thibodeau boys didn't do it," while one of Breckenridge's relatives testified Breckenridge added, "the bitch ain't going to be found," "[i]t's a waste of government's time to be finding her." Bohrer, Steen, and Breckenridge each "stood to benefit nothing by disclosing his role in the" crime (see Chambers, 410 US at 301).
Contrary to the People's argument, it is not insignificant or irrelevant to our analysis that the various statements connected these declarants and pronounced their guilt of abducting the victim, her murder, and the subsequent cover-up. Far from suggesting fabrication or misperception, the interconnected and mutually-confirming nature of the statements reaffirms their reliability and the "hallmark of trustworthiness" attributed to declarations against penal interest (Maerling, 46 NY2d at 299). The quantity of overlapping statements also lends further support for their admission, and the majority's assertion that the aggregate of statements is irrelevant is contrary to United States Supreme Court precedent (see majority op at 
1161). In Chambers, the Court recognized that quantity matters: "[t]he sheer number of independent confessions provided additional corroboration for each" (410 US at 300). The corroboration is even stronger in defendant's case. The defendant in Chambers sought to introduce four independent confessions by third parties (id. at 291-292), whereas here defendant presented evidence of over 10 independent confessions.[FN7]
{**31 NY3d at 1181}The hearing court also improperly factored into its admissibility determination its own conclusion that the statements were false. This was error, as this Court has held that a court's belief regarding a statement's veracity is irrelevant (see DiPippo, 27 NY3d at 137, quoting Settles, 46 NY2d at 170). Instead, the court is tasked solely with deciding whether defendant has met the minimum threshold of establishing a reasonable possibility of the statement's truth. Once that burden is met, the veracity of the statement is a question for the jury. As we reaffirmed in Soto, "it is the function of the jury alone to determine whether the declaration is sufficient to create reasonable doubt of guilt" (26 NY3d at 462; cf. People v Shabazz, 22 NY3d 896, 898 [2013] ["(w)e conclude that the courts below erred by focusing on the inconsistency between the (declarant's) trial testimony and her pretrial statement . . . later recantations generally affect the weight and credibility that a factfinder should ascribe to the statement"]).
According to the majority, record support exists for the conclusion that "certain witnesses . . . were simply not credible" (majority op at 
1162). As noted above, however, the only question properly before the hearing court was whether the admissible evidence was "of such character as to create a probability" that a jury would render a more favorable verdict (see CPL 440.10 [1] [g]). To the extent County Court determined that these statements were in fact false, it went beyond the scope of the hearing; to the extent it determined that a trier of fact could not reasonably find these witnesses credible as a matter of law, its reasoning was unsound and constituted an abuse of discretion. The majority's singular focus on County Court's "factual" credibility findings misses the point and harkens back to People v Crimmins (38 NY2d 407 [1975]). This Court roundly repudiated Crimmins' " 'hands-off' approach" only a few years ago, as it "needlessly restricted this Court's power of review concerning CPL 440.10 (1) (g) motions" (Jones, 24 NY3d at 627-631).
Careful examination of the testimony establishes that the court often had no rational basis for its conclusion that the witnesses were rendered incredible as a matter of law by factual inconsistencies. As an example, the majority points to Priest's affidavit, in which defendant sought to introduce Priest's description of how Steen had told her in 2006 that he, Bohrer,{**31 NY3d at 1182} and Breckenridge brought the victim to Breckenridge's house on Rice Road, beat her to death, cut up her body and hid it in a cabin, and burned her clothing in the cabin's wood stove. Steen described the cabin as being deep in the woods, at the edge of a clearing, and past railroad tracks. The court dismissed this testimony because, the court noted, the only cabin on Rice Road found by investigators was not near any railroad tracks and did not contain a wood stove. Nevertheless, there was a "collapsed" cabin at the address, which, according 
to Wescott's directions to the police, is located down the road from railroad tracks. Further, investigators reported the cabin appeared to have been "sifted through," and three cadaver dogs indicated there for the scent of human remains.[FN8]
[*14]The hearing court similarly erred as a matter of law by discrediting Combes' testimony—that Breckenridge told him, "[w]e chopped her up, we put her in a wood stove and put her in a vehicle and sent her to Canada"—on the basis that Combes did not believe Breckenridge to be speaking truthfully. The question is the underlying reliability of the statement itself, not the witness' personal beliefs about that statement. As this Court has made clear, it is for the jury to decide what weight, if any to accord, the statement and to what extent the evidence informs the jury's determination of defendant's guilt (see e.g. Settles, 46 NY2d at 170 ["it is the function of the jury alone to determine whether the declaration is sufficient to create reasonable doubt of guilt"]).[FN9] {**31 NY3d at 1183}
III.
Defendant met his burden of showing by the preponderance of the evidence that "[n]ew evidence has been discovered . . . which is of such character as to create a probability" of a verdict "more favorable to the defendant" (see CPL 440.10 [1] [g]). It is also noteworthy that the People's trial evidence was not overwhelming. No physical or testimonial evidence at trial placed defendant at the store at the time the victim disappeared, and no forensic evidence was found at defendant's home or in Richard's van linking defendant to the victim.[FN10] It is difficult to [*15]imagine these statements would not have "added a little more doubt to the jury's view of the evidence" (People v Negron, 26 NY3d 262, 270 [2015] [internal quotation marks omitted]), such that there would have been enough uncertainty as to defendant's guilt to tip the scales in his favor. Thus, the hearing court's denial of defendant's CPL 440.10 (1) (g) motion "constituted an abuse of discretion as a matter of law" (see Jones, 24 NY3d at 630). Defendant is entitled to present this newly discovered evidence to a jury. I dissent.
Chief Judge DiFiore and Judges Stein, Fahey and Garcia concur; Judge Rivera dissents in an opinion in which Judges Wilson and Feinman concur.
Order affirmed, in a memorandum.

Footnotes

Footnote 1:Defendant and his brother, Richard, were indicted jointly, but tried separately. Richard Thibodeau was acquitted after trial.

Footnote 2:The need for corroborating evidence is especially apparent in high-profile cases, as it is not uncommon—for a variety of reasons—for individuals to make statements claiming responsibility for notorious crimes they did not commit (see e.g. State v Paredes, 775 NW2d 554, 567 [Iowa 2009] [noting that 200 persons confessed to kidnapping the Lindbergh baby]). Such statements, particularly those made long after someone else has been prosecuted for the offense, should "be treated with a fair degree of skepticism" (see generally Herrera v Collins, 506 US 390, 423 [1993, O'Connor, J., concurring]).

Footnote 3:The dissent inexplicably views the trial testimony from witnesses who identified Richard's van as the vehicle they saw—both at the scene and driving erratically on the morning of the abduction—as corroboration for the declarant's statements (see dissenting op at 
1176 n 4).

Footnote 4:The dissent's suggestion that the quantity of "interconnected and mutually-confirming . . . statements" found unreliable by the courts below somehow "reaffirms their reliability" (dissenting op at 
1180) completely undermines our evidentiary rule of independent corroboration to ensure the reliability of the declaration against penal interest and is plainly inconsistent with Chambers. The Supreme Court has
"recognized that state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials . . . Only rarely [has the Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. See Holmes [v South Carolina, 547 US 319, 331 (2006)] (rule did not rationally serve any discernible purpose); Rock v. Arkansas, 483 U.S. 44, 61 (1987) (rule arbitrary); Chambers v. Mississippi, 410 U.S. 284, 302-303 (1973) (State did not even attempt to explain the reason for its rule); Washington v. Texas, 388 U.S. 14, 22 (1967) (rule could not be rationally defended)" (Nevada v Jackson, 569 US 505, 509 [2013] [internal quotation marks omitted]).
In Chambers, the Supreme Court did not dispense with the need for reliability of the evidence but observed that the statements at issue were made "under circumstances that provided considerable assurance of their reliability," including that they were made to close acquaintances shortly after the crime and were corroborated by other evidence in the case (see 410 US at 300). The "sheer number of independent confessions" referred to in Chambers was "additional corroboration" of the statements—not the sole marker of their reliability (410 US at 300 [emphasis added]).
Footnote 5:In citing to Cardozo's statement that the courts must do their duty and not shift their responsibility to a new jury, we certainly did not remotely intimate as suggested by the dissent that the trial court should ignore the hearing evidence or that the appellate court should not exercise its reviewing powers on the appeal.

Footnote 1:As pointed out by the dissent below, Richard could have returned to the van and been the driver, given that at least one minute elapsed between when the man Swenszkowski described as Richard entered the store and when Swenszkowski eventually saw the van move.

Footnote 2:Defendant argued at trial and on this appeal that the inmates were not credible because they received favorable deals in exchange for speaking with prosecutors, who sentenced them to probation on their respective pending charges, and because of inaccuracies in their accounts.

Footnote 3:William Pierce, an eyewitness who did not come forward until after the trial, testified at the hearing that he saw Steen hit the victim in the back of the neck and drag her into a white van. Pierce had first told the police that the defendant was the perpetrator, but upon seeing a photo of Steen in the newspaper realized it was Steen who he had seen that morning.

Footnote 4:Defendant also relied on evidence from his trial. For example, Fabian and Bivens testified that a light-colored van was involved in the abduction, which Bivens first told police was the style of Richard's van but a different color. Defendant now argues that indeed there was a light-colored van used in the victim's abduction, but it was other than his brother's: Breckenridge and Steen both stated that that they used a van to kidnap and then dispose of the victim's body, and Steen specified that it was Bohrer's white van. The fact that the trial witnesses' accounts either barely or not at all conflict with Steen and Breckenridge's retelling lends credence to their statements. Bivens also testified to seeing one of her abductors hold the victim in a "bear hug" in front of the van, which matches Steen's description of the abduction:
 "[Steen] went in some side door, Roger went in the front doors to keep her distracted while [Steen] came in and grabbed her from behind the counter, Michael stayed [in the] van. [Steen] said once he grabbed her, Roger helped grab her and they went back out the side door, when they got outside the doors of the van were open, [Steen] described bear hugging her and slamming her into the van."
Footnote 5:As further evidence of Murtaugh's involvement, Wescott texted him soon before her interview with the police. She told the police she had done so "[b]ecause supposedly Tonya said the van was junked there." In fact, Priest revealed no such detail on the call, and never mentioned Murtaugh's name.

Footnote 6:According to the majority, "the structure was already partially or totally collapsed at the time of the crime in 1994, which was inconsistent with [Steen's] alleged admissions" (majority op at 
1161). Conflicting evidence does not render such statements inadmissible (see e.g. DiPippo, 27 NY3d at 133 [reversible error to exclude third-party hearsay confession, notwithstanding testimony of eyewitness that the man she saw with the victim was not the declarant]). Thus, the majority's quarrel seems to be with our precedent, which sets a low burden of proof: whether sufficient corroboration exists to "establish[ ] a reasonable possibility that the statement might be true" (id. at 137, quoting Settles, 46 NY2d at 169-170). In any event, the only testimony on this point presented at the hearing was by a neighbor who stated, "I believe it was half caved in, maybe fully caved in, I can't really remember. I know it was caved in a little bit." That the cabin was "caved in a little bit" is not necessarily inconsistent with the use of the cabin to hide a body, and County Court never made such a determination. Also, contrary to the majority's representation of the record, there was no testimony that the structure was in this dilapidated condition "at the time of the crime," but only at some point in 1994.

Footnote 7:Chambers presented a similar case to this one. At his murder trial, defendant Leon Chambers introduced Gable McDonald's sworn statement confessing to shooting the victim, along with two eyewitnesses to McDonald's involvement. On cross-examination by the State, McDonald repudiated his confession and testified that he did not shoot the victim. Chambers endeavored to introduce testimony of three of McDonald's friends, who each stated that McDonald had confessed the crime to them. The trial court excluded the testimony on hearsay grounds. The Supreme Court held that "[t]he testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest," and "[t]hat testimony also was critical to Chambers' defense" (Chambers, 410 US at 302). Therefore, in excluding the confessions, the trial court had "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" (id.).

Footnote 8:The majority adopts the hearing court's credibility analysis of Priest, in part because Priest was not called by the defense to testify at the hearing (majority op at 
1162). The majority ignores that, during the proceedings regarding admission of the affidavit, defense counsel explained that they believed Priest's testimony was unnecessary given her sworn statement and wanted to avoid subjecting Priest to additional harassment. This concern was not unfounded. According to Wescott, Priest moved with her children to Michigan because she was afraid of her ex-husband. The hearing court considered the issue and admitted Priest's affidavit into evidence. Of course, defendant would have to present Priest at trial (see DiPippo, 27 NY3d at 138 [discussing that an affidavit containing third-party culpability evidence is sufficient in an admissibility hearing on the understanding that the witness will be made available at trial]).

Footnote 9:The majority quotes Judge Cardozo's concurrence in People v Shilitano (218 NY 161, 180 [1916]) (see majority op at 
1163), to suggest that a hearing court judge is at liberty to deny a motion based solely on the judge's credibility decisions, regardless of the evidence presented, and an appellate court is without authority to consider the correctness of the judge's decision. That is not the law (see e.g. Soto, 26 NY3d at 462; Settles, 46 NY2d at 170). Curiously, while acknowledging our power of appellate review, the majority has chosen as support a case with no relevance here as it involves standards only applicable in capital cases.

Footnote 10:The majority complains that I have engaged in a de novo and skewed analysis of the weight of the evidence at both the trial and the hearing in favor of defendant (majority op at 
1162). Putting aside the majority's hyperbole, I have done exactly what we are authorized and required to do: "exercising our power to determine whether in a particular judgmental and factual setting there has been an abuse of discretion as a matter of law" (Jones, 24 NY3d at 631 [internal quotation marks omitted]). "[W]e are not passing on facts as such, but rather considering them to the extent that they are a foundation for the application of law" (id. [internal quotation marks and citation omitted]). In short, I have subjected this evidence to our well-established legal standards.