People v Mansfield (2024 NY Slip Op 00339)

People v Mansfield

2024 NY Slip Op 00339

Decided on January 25, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 25, 2024

112519 113594
[*1]The People of the State of New York, Respondent,
v
Marcus Mansfield, Appellant.

Calendar Date:December 14, 2023

Before:Egan Jr., J.P., Pritzker, Ceresia, Fisher and Powers, JJ.

Hug Law PLLC, Albany (Matthew C. Hug of counsel), for appellant, and appellant pro se.
P. David Soares, District Attorney, Albany (Emily A. Schultz of counsel), for respondent.

Egan Jr., J.P.
Appeals (1) from a judgment of the Supreme Court (Roger D. McDonough, J.), rendered August 25, 2020 in Albany County, upon a verdict convicting defendant of the crimes of tampering with physical evidence, conspiracy in the fourth degree (two counts), attempted criminal possession of a weapon in the second degree (three counts) and attempted criminal possession of a controlled substance in the fourth degree, and (2) by permission, from an order of said court, entered July 15, 2022 in Albany County, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
After Zaquan Woody was shot in the early morning hours of July 16, 2019, codefendant Tajia Lewis drove him to the emergency room at Albany Medical Center (hereinafter the hospital) in her blue 2002 Honda Accord. The pair arrived around 2:15 a.m. and, after Woody was brought into the hospital, she declined the request of a police officer to leave the vehicle near the entrance and instead parked it in the hospital's parking garage across the street. The officer got the description of the vehicle and its plate number and gave it to his dispatcher. Other police officers soon arrived, were asked to find the Honda Accord and, after locating it on the second level of the parking garage, were directed to guard the vehicle and prevent anyone from entering it until detectives arrived with a search warrant to process it for evidence related to the shooting.
Security cameras placed around the hospital and in the parking garage, video footage from the bodycameras of the officers guarding the Honda Accord, testimony from those officers and defendant's telephone records document in detail what happened over the next two hours. Defendant, codefendants Oudasha Gause, Michael Carter and Nysein Tolbert, and others arrived in the half hour after Lewis dropped Woody off at the hospital, with defendant arriving in a Chrysler and Gause and Tolbert arriving in a gray Honda Civic. Those individuals were in contact, both in person and by phone, with one another and with Lewis. The vehicles that dropped defendant, Gause and Tolbert off can be seen driving by the blue Honda Accord and the patrol car in the parking garage, and defendant can be seen walking up and down the stairwell in the parking garage before going outside to speak to Gause and others. After several brief phone calls with defendant, Lewis approached the Honda Accord around 3:40 a.m. and asked the officers guarding it if she could retrieve her purse. The officers told her that she could not, and she left. Gause made a similar attempt to retrieve items from the vehicle around 4:30 a.m., also after several phone calls from defendant, and she was sent on her way emptyhanded.
Shortly after Gause left, and following a quick series of phone calls and text messages between her, defendant, Lewis and Catherine Karczewski, defendant and codefendants executed a ploy to access the Honda Accord and remove items from [*2]it. Karczewski had already driven a vehicle — the gray Honda Civic that had brought Tolbert and Gause to the hospital earlier — into the parking garage and parked it on the third level. About a minute after Gause's unsuccessful effort to retrieve items from the Honda Accord and a brief phone call with defendant, Karczewski walked down to the second level and asked the officers on guard to look at the gray Honda Civic, which had been struck by gunfire. One of the officers went with Karczewski to the third level of the garage, while the other got out of their patrol car and stood by the Honda Accord. Four minutes later, a blue Honda Civic drove up to the second level, and defendant and his four codefendants got out of the car and headed toward the remaining officer. Lewis began arguing with the officer that she could take her car and headed toward the driver's side of the vehicle, with the officer reiterating that she could not and yelling to his partner on the third level. The other officer began running down the ramp to the second level and radioed for backup, already en route, to step on it. Gause opened the Honda Accord's trunk while the officer was preoccupied with Lewis and grabbed a bag out of it, prompting the officer to try to close the trunk and then grapple with Gause. The officer secured the bag, and the other officer returned to the scene in time to push Gause to the ground and place her under arrest; while the officers were distracted by Gause, Lewis grabbed another bag out of the trunk. Lewis threw the bag into the blue Honda Civic, which had pulled up, through an open window. Defendant looked into the trunk himself and blocked one of the officers from pursuing Lewis.
Unfortunately for the plotters, backup then arrived in the form of a second patrol car. The driver of the blue Honda Civic threw the bag out of the vehicle, swerved around the second patrol car and took off, leaving defendant and codefendants to fend for themselves. Defendant initially made a move for the bag that had been tossed onto the ground but, after one of the officers beat him there, fled with the three codefendants who had not (yet) been taken into custody. Defendant and the others were quickly apprehended as they attempted to escape the parking garage, while the getaway car was found abandoned nearby a few days later. The bag tossed out of the blue Honda Civic contained a hard handgun case holding a Smith & Wesson .40 caliber pistol, a Glock 9 millimeter pistol and a Ruger .380 caliber pistol, clips of live ammunition for each and almost 10 grams of cocaine.
Defendant and codefendants were charged in an indictment with tampering with physical evidence, conspiracy in the fifth degree, three counts of criminal possession of a weapon in the second degree, three counts of attempted criminal possession of a weapon in the second degree, two counts of conspiracy in the fourth degree, criminal possession of a controlled substance in the fourth degree and attempted criminal [*3]possession of a controlled substance in the fourth degree. The conspiracy in the fifth degree count was dismissed at the outset of trial and, during the jury trial on the remaining charges against defendant, Supreme Court dismissed a sworn juror who had fallen asleep while the video evidence was being shown. At the conclusion of the trial, the jury convicted defendant of tampering with physical evidence, the conspiracy in the fourth degree counts, and the attempted weapon possession and the attempted drug possession counts, but acquitted him of the remaining counts. Supreme Court determined that defendant was a second violent felony offender and sentenced him to concurrent terms of six years in prison and five years of postrelease supervision upon each attempted weapon possession conviction and lesser concurrent prison terms upon the remaining convictions. Defendant appeals from the judgment of conviction and, by permission, from the subsequent order denying his CPL article 440 motion to vacate that judgment without a hearing.
We affirm. To begin, the verdict is supported by legally sufficient evidence and is not against the weight of the evidence. Defendant primarily suggests that the trial evidence did not establish that he knew what the codefendants were attempting to recover from the trunk of the Honda Accord or that he intended to prevent the police from finding the handguns and cocaine. As noted above, however, that evidence included telephone records and video footage demonstrating that defendant was, among other things, communicating with Lewis and Gause when they were separately attempting to get into the Honda Accord and with Karczewski when she lured one of the officers away from that vehicle. The video footage, as well as the testimony of the officers guarding the Honda Accord, also left no doubt that defendant was an active participant in the ensuing effort to overwhelm the remaining officer and retrieve the bag containing the handguns and cocaine from the trunk of the Honda Accord. Although defendant did not personally grab that bag, the video footage clearly shows defendant blocking one of the officers from reaching Lewis when she did and then making a move to retrieve the bag after it was thrown on the ground by the would-be getaway driver.
"Knowledge, of course, may be shown circumstantially by conduct," and defendant's communications, movements and actions on the night in question readily permitted the jury to infer that he knew what was in the Honda Accord and that he acted in concert with the codefendants to not only devise and execute a plan to retrieve the handguns and cocaine from the vehicle's trunk, but to conceal the existence of that evidence from authorities (People v Reisman, 29 NY2d 278, 285 [1971], cert denied 405 US 1041 [1972]; see e.g. People v Whatley, 69 NY2d 784, 785 [1987]; People v Austin, 290 AD2d 225, 226 [1st Dept 2002], lv denied 97 NY2d 750 [2002]; People v Hames, 261 AD2d 193, 193 [1st Dept 1999], lv [*4]denied 93 NY2d 1003 [1999]; People v Coll, 157 AD2d 502, 502-503 [1st Dept 1990], lv denied 76 NY2d 732 [1990]).[FN1] The proof also left no question that the efforts of defendant and the codefendants came very near to succeeding so as to constitute attempts to possess the handguns and cocaine; indeed, they did retrieve the handguns and cocaine from the Honda Accord and would have likely succeeded in getting away with them but for the arrival of the second patrol car (see People v Naradzay, 11 NY3d 460, 467 [2008]; People v Mahboubian, 74 NY2d 174, 189-190 [1989]). The evidence at trial was therefore, when viewed in the light most favorable to the People, legally sufficient to support the verdict in all respects (see People v Cintron, 95 NY2d 329, 332 [2000]; People v Young, 209 AD3d 1278, 1278-1279 [4th Dept 2022], lv denied 39 NY3d 988 [2022]; People v Sanders, 185 AD3d 1280, 1286 [3d Dept 2020], lv denied 35 NY3d 1115 [2020]; People v Best, 26 AD3d 275, 275-276 [1st Dept 2006], lv denied 7 NY3d 752 [2006]). Further, although the proof did not reveal what was said between defendant and the others in the leadup to the plot to obtain the handguns and cocaine, and Lewis testified that she never told defendant what was in the trunk of the Honda Accord and that it was she and Gause who hatched the plan to retrieve the handguns and cocaine, the jury nevertheless credited the extensive evidence reflecting that defendant was knowingly involved in developing and executing that plan. Viewing the evidence in a neutral light and according deference to the jury's determination to credit that proof, we cannot say that the verdict is against the weight of the evidence (see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Sanders, 185 AD3d at 1286).
Next, we are unpersuaded that Supreme Court deprived defendant of his right to a jury trial by discharging a juror who appeared to be sleeping during the presentation of evidence. "A court must discharge a juror who is determined to be 'grossly unqualified,' including a juror who did not hear all of the evidence in a case because he or she fell asleep" (People v Buel, 53 AD3d 930, 931 [3d Dept 2008] [citations omitted], quoting CPL 270.35 [1]; see People v Young, 160 AD3d 1206, 1209 [3d Dept 2018], lv denied 31 NY3d 1155 [2018]). Supreme Court here observed a juror sleeping for "extended periods of time" during the presentation of visual evidence and, after alerting counsel to that fact, "promptly conducted a 'probing and tactful inquiry' of the juror in the presence of counsel" as required (People v Robinson, 121 AD3d 1179, 1181 [3d Dept 2014], quoting People v Cargill, 70 NY2d 687, 689 [1987]). The juror admitted during that inquiry that he had "briefly" fallen asleep during the trial and, when coupled with Supreme Court's personal observations of the juror nodding off "for periods of time that could run up to 30 seconds" during the presentation of evidence, the court properly responded by discharging the juror and [*5]replacing him with an alternate (see People v Urena, 183 AD3d 534, 534 [1st Dept 2020], lv denied 35 NY3d 1071 [2020]; People v Snowden, 44 AD3d 492, 493 [1st Dept 2007], lv denied 9 NY3d 1039 [2008]; People v Rogers, 266 AD2d 481, 482 [2d Dept 1999], lv denied 94 NY2d 884 [2000]).
Defendant further contends, in his pro se supplemental brief, that the People exceeded the scope of Supreme Court's Molineux ruling by making statements and eliciting testimony regarding the shooting of Woody and the existence of a romantic relationship between defendant and Karczewski. By failing to make objections to such during trial, the argument is unpreserved for our review (see People v Serrano, 200 AD3d 1340, 1348 [3d Dept 2021], affd 38 NY3d 1180 [2022]). His related contention that trial counsel rendered ineffective assistance by failing to address those alleged violations is unavailing. First, the Molineux ruling was largely aimed at precluding the People from offering details regarding the shooting and the fact that there was a domestic dispute between defendant and Karczewski in November 2019, and the People did not elicit testimony about, or otherwise refer to, those points. It is true that the People elicited testimony that defendant had a romantic relationship with Karczewski and referred to that relationship in their summation. The People only did so in response to the cross-examination of a police detective by defense counsel as to what "acquaintances" like defendant and Karczewski might have been saying to one another in the leadup to the attempt to retrieve the bag, however, and Supreme Court had made clear that the People could inquire into the nature of the relationship between defendant and Karczewski if defendant opened the door to that inquiry. As such, we cannot say that defense counsel was ineffective in "failing to raise an objection that had little or no chance of succeeding" (People v Perez, 183 AD3d 934, 937 [3d Dept 2020], affd 36 NY3d 1093 [2021]). Further, although defense counsel did not seek corrective action when he inadvertently elicited the same detective's opinion that defendant went to the hospital because he was in the vicinity of Woody at the time of the shooting, we cannot say that such was ineffective in that "counsel may well have concluded that an objection would have only drawn unwanted attention to" the statement (People v Masi, 151 AD3d 1389, 1391 [3d Dept 2017], lv denied 30 NY3d 1062 [2017]; see People v Case, 197 AD3d 985, 988 [4th Dept 2021], lv denied 37 NY3d 1160 [2022]). Our review of the record instead leaves us satisfied that counsel — who mounted a cogent defense in the face of damning proof against defendant and secured an acquittal on the most serious charges against him — afforded defendant with meaningful representation (see People v Wilkins, 216 AD3d 1359, 1364-1365 [3d Dept 2023], lv denied 40 NY3d 1000 [2023]; People v Bateman, 212 AD3d 993, 997 [3d Dept 2023], lv denied 39 NY3d 1140 [2023]).
Defendant [*6]next contends that he was improperly adjudicated a second violent felony offender for sentencing purposes. An individual may be sentenced as a second violent felony offender if he or she stands convicted of a violent felony offense and has previously been convicted of a violent felony offense, including a prior conviction "in any other jurisdiction . . . which includes all of the essential elements of any such [violent] felony for which a sentence to a term of imprisonment in excess of one year . . . was authorized and is authorized in this state irrespective of whether such sentence was imposed" (Penal Law § 70.04 [1] [b] [i]; see Penal Law § 70.04 [1] [a]). The People came forward with proof that defendant was convicted and sentenced in 2018 of burglary into an occupied dwelling in violation of section 1201 (c) (3) (A) of title 13 of Vermont Statutes Annotated. Although defendant correctly observes that section 1201 criminalizes burglary in general and sets forth different punishments depending upon the type of burglary committed, a review of the statutory language establishes that the elements required to commit burglary into an occupied dwelling render that offense equivalent to a New York violent felony (see generally People v Helms, 30 NY3d 259, 263-264 [2017]; People v Jurgins, 26 NY3d 607, 613 [2015]). Burglary into an occupied dwelling requires that a defendant enter or remain in "a building used as a residence" without license or privilege to do so and with the intent to commit specified offenses, and the statutory scheme leaves no question that such constitutes a felony exposing him or her to a sentence of up to 25 years in prison (Vt Stat Ann tit 13, § 1201 [b] [2]; see Vt Stat Ann tit 13, §§ 1; 1201 [a], [c] [3] [A]). Those elements are equivalent to the ones required to commit the violent felony of burglary in the second degree (see Penal Law §§ 70.02 [1] [b]; 70.04 [1] [a], [b] [i]; 140.25 [2]), and Supreme Court therefore properly determined that defendant was a second violent felony offender.
As a final matter upon defendant's direct appeal, "[w]hile the sentence imposed was greater than that offered to defendant during plea negotiations, there is nothing in the record establishing that he was punished for asserting his right to trial or that the lengthier sentence ultimately imposed was the result of vindictiveness or retaliation" (People v Alexander, 160 AD3d 1121, 1124 [3d Dept 2018], lv denied 31 NY3d 1144 [2018]; accord People v Houze, 177 AD3d 1184, 1189 [3d Dept 2019], lv denied 34 NY3d 1159 [2020]). To the contrary, Supreme Court made clear that its sentence was based upon the proof at trial demonstrating that defendant was not, as he had claimed, "somehow less culpable than . . . the two women who actually grab[bed] items out of the trunk," but was instead "an active and essential participant" in the effort to recover the handguns and cocaine. In view of defendant's prior criminal history and his lack of remorse, we also [*7]do not perceive that sentence to be unduly harsh or severe (see People v Hightower, 186 AD3d 926, 932 [3d Dept 2020], lv denied 35 NY3d 1113 [2020]; People v Murray, 155 AD3d 1106, 1111 [3d Dept 2017], lv denied 31 NY3d 1015 [2018]).
We accordingly turn to the appeal from the denial of defendant's CPL article 440 motion, which was premised upon contentions that evidence outside of the record reflected that he received ineffective assistance and that he was actually innocent of the charges for which he was convicted. Defendant's ineffective assistance claim primarily rests upon his contention that he alerted trial counsel to leads that might have led to exculpatory evidence and that trial counsel failed to investigate them, but offered little beyond his own account of what steps trial counsel took to look into those leads and failed to provide either an affirmation from trial counsel describing his investigative efforts or an explanation for that affirmation's absence (see People v Wright, 27 NY3d 516, 522 [2016]; People v Johnson, 221 AD3d 1172, 1176 [3d Dept 2023]; People v Hinds, 217 AD3d 1138, 1142 [3d Dept 2023], lv denied 40 NY3d 951 [2023]; compare People v Cruz, 152 AD3d 822, 825 [3d Dept 2017], lv denied 30 NY3d 1018 [2017] [trial record demonstrated counsel's awareness of potentially exculpatory video footage]). As Supreme Court properly noted, summary denial of that aspect of the motion was warranted as a result.
Defendant's further claim of actual innocence demanded "newly discovered proof constituting clear and convincing evidence of factual innocence, not mere legal insufficiency of evidence of guilt" (People v Williams, 182 AD3d 776, 779 [3d Dept 2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1071 [2020]; see People v Hinds, 217 AD3d 1138, 1141 [3d Dept 2023], lv denied 40 NY3d 951 [2023]; People v Mosley, 155 AD3d 1124, 1125 [3d Dept 2017], lv denied 31 NY3d 985 [2018]). Defendant came forward with his own affidavit, as well as affidavits from Gause, Lewis, Karczewski and four other individuals. Assuming that those affidavits constituted newly discovered evidence, they, in brief, set forth a version of events in which defendant was an innocent bystander who had a legitimate reason to be at the hospital because his cousin had died there earlier in the day, whose communications with Gause, Lewis and Karczewski were related to requests for rides or for various innocuous items, and who had no idea what was in the Honda Accord and only accompanied the codefendants to the parking garage because he knew Karczewski was there and would give him a ride home. The validity of that account was undermined by the serious inconsistencies in the affidavits themselves; for example, defendant claimed that he was at the hospital because his cousin had died there earlier in the day, while Karczewski stated that he was there to visit Woody, and Lewis stated that she called defendant to tell him that Woody had been shot and to [*8]meet her there. More seriously, however, the overall claim that defendant was in the wrong place at the wrong time was simply unbelievable in view of the proof at trial showing, among other things, the number of calls between him and Gause, Lewis and Karczewski and their timing, as well as the video footage of the attempt to retrieve the handguns and cocaine in which he is seen blocking the officers from reaching Lewis as she was carrying the bag containing those items to the blue Honda Civic, making a move for the bag after it was thrown onto the floor of the garage by the getaway driver, and then fleeing with his codefendants. Supreme Court accordingly found that the additional proof provided by defendant, at best, "raised '[m]ere doubt as to the defendant's guilt, or a preponderance of conflicting evidence as to the defendant's guilt,' neither of which is sufficient to support a motion to vacate a judgment based on actual innocence" (People v Mosley, 155 AD3d at 1126, quoting People v Hamilton, 115 AD3d 12, 27 [2d Dept 2014]). We agree with that assessment and, thus, perceive no abuse of discretion in the denial of defendant's motion without a hearing.
Pritzker, Ceresia, Fisher and Powers, JJ., concur.
ORDERED that the judgment and the order are affirmed.

Footnotes

Footnote 1: Notwithstanding defendant's suggestion to the contrary, the fact that the guns and drugs were quickly recovered after their removal did not prevent a finding that he committed the crime of tampering with physical evidence (see e.g. People v Davis-Ivery, 59 AD3d 853, 855 [3d Dept 2009]).